Frances Broaddus **CRUTCHFIELD and Henry Ruffin Broaddus, Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS and County of Hanover, Virginia, Defendants.**

No. Civ.A. 300CV525.

United States District Court, E.D. Virginia, Richmond Division.

Aug. 14, 2001.

William B. Ellis, Ellis & Thorp, Richmond, VA, for Plaintiffs.

M. Hannah Lauck, United States Attorneys Office, Richmond, VA, Gregory S. Williams, U.S. Department of Justice, Environmental Defense, Richmond, VA, Katherine D. Will, U.S. Army Corps of Engineers, Norfolk, VA, for U.S. Army Corps.

Sterling E. Rives, III, Hanover County Attorney's Office, Hanover, VA, William G. Broaddus, Robert M. Tyler, McGuire Woods LLP, Richmond, VA, for Hanover Co.

## MEMORANDUM OPINION

PAYNE, District Judge.

In this action, Frances Broaddus Crutchfield and Henry Ruffin Broaddus challenge the authorization, under the Clean Water Act ("CWA"), by the United States Army Corps of Engineers ("the Corps") of Nationwide Permits ("NWPs") for the County of Hanover ("the County"). The NWPs verify the construction, without preparation of an Environmental Assessment or an Environmental Impact Statement as required by the National Environmental Policy Act ("NEPA"), of a wastewater treatment plant ("WWTP"), discharge force main, and an outfall[1] by the County. It is also alleged that the NWPs were unlawfully verified because the Corps did not first comply with the National Historic Preservation Act ("NHPA"). The challenges center around the relationship of the WWTP, force main and outfall components of a sewage treatment project to a sewer interceptor that is proposed to transport sewage to the WWTP and that, until recently, was referred to as a component of that sewage

---

1. The administrative record and pleadings refer to this component as an outfall, outfall diffuser, discharge outfall, diffuser, or outfall. This Memorandum Opinion will refer to it as an outfall.

treatment project.[2]

Crutchfield and Broaddus challenge the NWPs under three substantive statutes and the Administrative Procedure Act ("APA"). Claim 1 alleges that the verification of the NWPs for the WWTP, force main, and outfall by the Corps violates the CWA, 33 U.S.C. §§ 1251 *et seq.*, and the Corps' regulations, 33 C.F.R. § 325.1 and 33 C.F.R. § 330.6. Claim 2 alleges that the verification of the NWPs violates NEPA, 42 U.S.C. §§ 4321 *et seq.* Claim 3 alleges that the verification of the NWPs violates the NHPA, 16 U.S.C. § 470 *et seq.*

The gravamen of each claim is that, in verifying the NWPs, the Corps improperly failed to take into account the impact of the planned Totopotomoy Creek Sewer Interceptor (hereinafter the "TC Interceptor") on the environment and on historic resources. Broaddus and Crutchfield argue that the TC Interceptor is simply another component of a complete project that includes, as its other components, the WWTP, force main, and outfall. The parties agree that a project may not proceed under an NWP if the Corps concludes that it has "more than minimal individual or cumulative net adverse effects on the environment or otherwise may be contrary to the public interest." C.F.R. § 330.1(d). It is undisputed that the entire project, i.e. the WWTP, force main and outfall and the TC Interceptor, if considered as a whole, was expected to have more than a minimal impact and that the Corps did not find otherwise. It is undisputed that the impact of the WWTP, force main and outfall is quite small and that the TC Interceptor,

standing alone, was expected to have a more than minimal impact.[3]

Broaddus and Crutchfield contend that the Corps acted arbitrarily and capriciously and in violation of law and regulation when, on a contrived, irrational basis, it did not take into account the impact of the TC Interceptor in verifying the NWPs here at issue. This, say the Plaintiffs, was the result of the improper manipulation of the permit process and the applicable permit regulations by the Corps and the County.

For the reasons set forth below, the action of the Corps verifying NWPs for the WWTP, force main, and outfall is found to be arbitrary, capricious and unlawful and, therefore, is set aside.

## THE FACTS OF RECORD

Review of the Corps' decisions must be based on the record. Hence, the facts in the record are set forth in detail.

### A. Early Days

Many years ago, the County identified its growing wastewater treatment needs and developed a sewage treatment project, the components of which were a WWTP, force main, outfall, and interceptor, to meet those needs. "Construction of the wastewater treatment plant is critical to the County implementing its Comprehensive Plan where growth is directed into the 'Suburban Service Area' in order to preserve the rural character of the remainder

---

**2.** Some early documents refer to three components: WWTP, force main/outfall, and interceptor. Most early documents refer to four components: WWTP, force main, outfall, and interceptor.

**3.** At a pre-application meeting among the Corps, the County, and Timmons, it was de-

termined that the TC Interceptor could not proceed under an NWP. R453. Actions that have a more than minimal impact cannot proceed under NWPs and this Court deduces that the TC Interceptor will have, or was expected to have, a more than minimal impact.

of Hanover County." R426.[4] Although a WWTP in the general vicinity of the proposed WWTP has been part of the County's comprehensive plan since 1972, R426, the County did not purchase the site for the proposed WWTP until 1997. R593. The County's plans envision that the sewage treated in the WWTP is to be transported by a discharge force main to an outfall which will discharge the treated effluent into the Pamunkey River approximately 43,500 feet from the plant. R426–27. The TC Interceptor, like the WWTP, has "been shown in the [County's] Comprehensive Plan for many years." R426.

## B. The Developments in 1997, 1998 and Early 1999

The TC Interceptor here at issue is the fourth phase of a sewer interceptor, the first phase of which was designed in 1983 and placed in service in 1985. The fourth phase TC Interceptor is the link between the existing interceptor and the WWTP.

The County's long-term plan began to jell when, in 1997, it settled on the exact location of the WWTP. In a report dated February 10, 1997, the County's outside consulting engineering firm, Timmons, recommended that the current location of the TC Interceptor be where it is today. R247–51. In that report (Totopotomoy Basin Wastewater Transport Options Letter Report), Timmons outlined the Basis of Analysis animating its recommendation. Among the "assumptions" used for those recommendations were:

- Totopotomoy Creek *WWTP* will be *completed by 2002.*

- *Flow* from pump station #5 (Atlee High School) *needs to be conveyed to the new WWTP at the time of its*

*opening* to provide sufficient flow for proper operation.

R248 (emphasis added). Thus, the record shows that the flow from the TC Interceptor is linked to the WWTP not only as the source of supply for the raw material that is to be treated at the WWTP, but also to assure proper operation of the WWTP itself. Even though site selection for the WWTP was not complete in 1997, the assumed site for the plant in February 1997 was the one on which the WWTP actually will be located. The February 1997 Letter Report on sewage transport options discusses three alternative modes for the proposed interceptor:

- Alternative A: Single Gravity Sewer
- Alternative B: Parallel Gravity Sewer
- Alternative C: Force Main.

R248–49. However, that report makes no mention of a location for the proposed TC Interceptor other than the one here at issue.

The February 1997 Letter Report on sewage transport options recommended the TC Interceptor be designed under Alternative A because the overall cost was less than two alternatives (neither of which was the Powhite Creek Pump Station which will be discussed later) and because *"[e]nvironmental permitting for utility lines fall under Nationwide permits at this time* and are relatively straightforward. *Future permitting requirements are unknown but are expected to become increasingly difficult* as new and more regulations are promulgated." R250 (emphasis added). Six months later, in August 1997, the County's Board of Supervisors issued a conditional use permit for a sewer interceptor running along Totopotomoy Creek to the site of the proposed

4. This Memorandum Opinion will cite the administrative record with "R" followed by the page number.

WWTP. R232. The location of the sewer line in the conditional use permit is the current location of the TC Interceptor.

Further work was performed by Timmons in the form of a Preliminary Engineering Report "for the proposed sewer interceptor which will convey sewage to the new Totopotomoy Wastewater Treatment Facility." R28. This, of course, was of considerable importance because "[t]he collection system [the sewer interceptor] is a sizeable portion of the *treatment system's* capital cost." *Id.* (emphasis added). According to the October 6, 1998 "Final Draft of the Totopotomoy Creek Sewer Interceptor Preliminary Engineering Report" ("P.E.R.") (a rather voluminous study):

> The anticipated construction of a new wastewater treatment plant (WWTP) in Hanover County has dictated that planning commence to determine how the wastewater will be transported to the new WWTP.

R28. Among the tasks assigned to Timmons was the selection of the "proposed route for the sewer interceptor" and "a preliminary design" for it. R28–29. The proposed sewer interceptor as selected and designed by Timmons in October 1998 is shown on a map attached to the P.E.R. R32. It begins at an existing sewage pump station (Pump Station No. 5) and runs east along Totopotomoy Creek for approximately 32,000 feet to the proposed WWTP. R426–27. The proposed interceptor is labeled on the map as "PROPOSED TOTOPOTOMOY CREEK SEWER INTERCEPTOR." R32.

During the fall of 1998, Broaddus and Crutchfield, who thought that they had convinced the County to move the outfall from their property, learned that the County had reverted to the plan to locate the outfall on their property. As a result of this change of plans, Broaddus and Crutchfield, through their counsel, communicated with state and federal officials, including the Corps, on the subject. R269–70, 279–93. In the course of that correspondence, counsel for Broaddus and Crutchfield expressed the view that the County would not be able to secure NWPs for the Totopotomoy wastewater treatment system because of the quantum of environmental and historical impacts of the project. R280, 293. On February 8, 1999, counsel for Broaddus and Crutchfield informed Elaine Holley (the Corps officer located in the County) that the County contemplated building the WWTP, TC Interceptor; force main and outfall and said that:

> We anticipate that, at some point, *Hanover County will be filing a permit application* with the Corps of Engineers in connection with this proposal. As you will see from the attached comments, there are substantial reasons to believe that *the effects of the project would be "more than minimal"* [the words of art that foreclose use of the NWP process] *and that an individual permit* [rather than an NWP] *therefore will be required.*

R296 (emphasis added). On March 18, 1999, the Chief of the Regulatory Branch at the Corps' Norfolk office stated that "[t]he Corps has not received an application for the project nor have we been contacted by the project proponent." R321.

The record here is thus that, in the spring of 1999, the County considered that the TC Interceptor could be built under NWP 12, but that Broaddus and Crutchfield considered otherwise and so informed the Corps which, as of March 1999, had not been in communication with the County on the project. Also, at this time, the County planned to construct the WWTP, the force main, the outfall and the TC

Interceptor so that all would be operational by 2003. The plan was that the sewage would reach the plant through the TC Interceptor. No other transport method, including the Powhite Creek Pump Station, was under consideration.

### C. The "Pre–Application Package" and the "Pre–Application Meeting"

On June 16, 1999, the County submitted to the Corps a "Pre–Application Package" (dated June 3, 1999). R424–32. According to that package, the WWTP will impact approximately 0.028 acres of wetlands for construction of the influent pump station and have no impact on waters;[5] construction of the force main will not have a permanent impact on wetlands or waters, but will temporarily impact approximately 0.06 acres of wetlands and/or waters; the outfall "will not have permanent impacts to wetlands or waters of the United States except for placement of the outfall diffuser on the river bottom." R427–28. And, according to that package, the TC Interceptor involves 35 acres of wetlands within 65 feet of the easement, of which 22 would be disturbed initially and 9 would be permanently cleared. R429, 451.

As described in the Pre–Application Package, the County considered it necessary to have all components of its long-term plan—the WWTP, force main, outfall, and TC Interceptor—operational between June 2002 and January 2003 to meet its growing wastewater treatment needs. R28, 426. The Pre–Application Package explains:

> In order to meet the wastewater treatment needs of its citizens, Hanover County is planning to construct a new 5 million gallon per day (mgd) wastewater treatment plant on a 128 acre tract of

land located off Pole Green Road approximately one mile east of Rural Point Road. The plant is being planned so that it can eventually be expanded to a 30 mgd facility if required. *A 32,000 feet interceptor sewer will carry raw wastewater to the wastewater treatment plant,* and a discharge force main will transport the treated effluent to a Pamunkey River discharge located approximately 43,500 feet away from the plant.

R426 (emphasis added).

The purpose of the Pre–Application Package was "to introduce regulatory agencies involved in the Section 401/404 permitting process [under the CWA] to construction activities and permanent improvements associated with Hanover County's proposed Totopotomoy Creek interceptor sewer and wastewater treatment projects." *Id.* In making the explanation, the County said:

> To convey wastewater from the Suburban Service Area to the new wastewater treatment plant, a gravity interceptor sewer is proposed along Totopotomoy Creek. *This gravity interceptor sewer will begin [a detailed description of path of the gravity sewer is given and it is the TC Interceptor].* This line is being designed with a nominal capacity of approximately 15 mgd.

R426–27 (emphasis added). The Pre–Application Package does not suggest any means of transport for sewage to the WWTP other than the proposed TC Interceptor.

A review of the record thus establishes that, early on, the County conceived of the WWTP, force main, outfall, and TC Interceptor as four components of the wastewater treatment project that was necessary to meet the County's growing wastewater

---

5. According to the August 23, 1999 cover letter from Timmons seeking verification for the WWTP, construction of the WWTP would impact 0.15 acres of wetlands. R463.

treatment needs. This project needed to be operational between June 2002 and January 2003. That was also the state of affairs as of June 3, 1999, when the County sent its plans to the Corps for its review and comments.

Timmons, the County's consultant on the project, sent a letter to the Corps dated June 4, 1999. The subject reference was: "Re: Totopotomoy Creek Interceptor Sewer and Wastewater Treatment Plant (Hanover County, Virginia)." R433. The opening paragraph of that letter tells the Corps that the "infrastructure proposed" is a WWTP, an outfall, force main to the outfall, and an "approximately 32,-000 linear feet of gravity sewer interceptor [the TC Interceptor] carrying wastewater along Totopotomoy Creek to the proposed wastewater treatment plant." *Id.*

Timmons went on to explain that, "[b]ased on the preliminary designs of *these infrastructure components, we anticipate authorization* for these projects *through the nationwide permit program, including* Nationwide Permit 26 for the proposed wastewater treatment plant, Nationwide Permit 7 for the proposed outfall structure, and *Nationwide Permits 12 and 33 for the proposed force main and gravity sewer interceptor.*" R433 (emphasis added). The copy of that letter in the record (apparently from the Corps' files) is annotated with the handwritten word "doubtful" which is connected by a line drawn from the word "doubtful" to the words "nationwide permit program" which the letter says is the "anticipated" vehicle by which the Corps was expected to authorize the project. *Id.*[6]

A pre-application meeting with representatives of the Corps, the County, and Timmons took place on July 14, 1999. R443, 448–53. Handwritten notes on an agenda from this meeting are in the record at R448–50. It is not clear who took these notes; however, the notes contain the cryptic entry:

—Co. sees interceptor + plant as 2 sep. projects ==> no problem
 —if intercept. no go; plant still needed to tre. w portion of Co.

R449.

Timmons prepared a memorandum that represents itself to be the "interpretation [by Rick Thomas of Timmons] of the discussions and decisions made at the [July 14] meeting." R452–53. The memorandum, which was sent to the meeting participants, including David Knepper of the Corps, states:

> The Totopotomoy Creek sewer interceptor, wastewater treatment plant, outfall force main, and outfall discharge have been presented together in the pre-application package. The County indicated that these projects are separate projects that are well coordinated to provide wastewater collection, treatment, and discharge. Therefore, each project should be permitted separately, with the exception of the outfall force main and outfall discharge into the Pamunkey River.

R452. The memorandum also explains that "[a]ppropriate authorization for the interceptor sewer has not been determined. The COE indicated that additional field review is required, and coordination with the Virginia Department of Historic Re-

---

**6.** Although the letter makes reference to discussions about "several specific areas of the proposed gravity sewer interceptor where the alignment has not been finalized," nothing in the Pre–Application package or the post-meeting notes mention the Powhite Creek Pump Station. Nor can one conclude from the record that the unsettled alignment referred to a location there. Instead, it appears that the reference has to do with placement of a few sections of the TC Interceptor.

sources will be required." R453. It was at this point that the County began to refer to what had been a four-component project as three different projects.

The record reflects then that, by July 1999, the County was aware that the applicable regulatory program for NWPs was soon to be revised, that the revisions were expected to be more strict, and that the Corps had not reacted favorably to the proposal that the entire project proceed under NWPs. The record also shows that the County and the Corps arrived at a solution to this conundrum at the July 14 meeting: segment the project so that the TC Interceptor, the component that foreclosed a "not more than minimal" impact finding, would be excised from the project and treated as a project in its own right.

It is significant to note that, as of July 14, 1999, the only record reference to the TC Interceptor as anything other than one of four components of the County's wastewater treatment project is the terse reference in the notes (R449) made by some unidentified person on July 14, 1999. Nonetheless, the Corps appears to have accepted the assertion of separateness reflected in those notes, notwithstanding that the County's plans, some of which were in the hands of the Corps, demonstrated that not be the case.

### D. The County's Request for NWP Verification and the Public Opposition

Thereafter, acting on what it understood to be the approval of the Corps, the County, in a package dated August 23, 1999, sought verification for NWP 26 from the Corps for the WWTP. R463. Shortly thereafter, in a package dated September 28, 1999, the County submitted to the Corps a joint permit application for the force main and outfall. R470.

Sometime between August and September 1999, when the County sought verification under NWPs for the WWTP and for the force main and outfall, Broaddus and Crutchfield learned about the applications. They filed objections on October 30, and November 1, 1999. R549–50.

On November 2, 1999, the Corps (responding to an earlier request) sent a copy of the requests for verification to counsel for Broaddus and Crutchfield. R552. Also, on November 2, 1999, counsel for Broaddus and Crutchfield sent a letter to the Virginia Marine Resources Commission explaining that, in his view, the County was trying to "piecemeal" the project by dividing "one single and complete activity ... into several discrete segments ... to evade proper regulatory scrutiny of and consideration of alternatives to the overall project." R555 (emphasis added). A copy of that letter was sent to Knepper at the Corps. Id.

On November 2, 1999, Timmons wrote to Knepper of the Corps that "[t]his permit verification [the regulatory act of authorizing the NWPs] is extremely time sensitive in light of the pending NWP–26 expiration, and the County's intention of conducting the permitted activity prior to the NWP–26 expiration." R554 (emphasis added). In other words, by November 2, the Plaintiffs and others had started to complain to the Corps, and other regulators (with copies to the Corps), about the permitting approach being pursued by the County; and the County, anxious about the limited time left to qualify under the NWPs, began to press the Corps for help in expediting verification of the pre-notification for the NWPs for the WWTP and the force main and outfall.

Between November 3 to November 9, 1999, the Corps and the Virginia Marine Resources Commission received several complaints about the "piecemeal" applica-

tions permitting process being pursued for the WWTP, force main and outfall, and TC Interceptor, including another letter from counsel for Broaddus and Crutchfield. R557–63. In that letter, counsel for the Plaintiffs asserted that "[a]t present, it is clear that ... [the County] is attempting to 'piecemeal' this project, and that it has not yet submitted a complete application to you." R557. The letter continued: "[t]he obvious purpose of this ploy is to evade regulatory scrutiny of the overall project and consideration of appropriate alternatives to the overall project," as is required for individual permits and for major federal actions significantly affecting the environment under NEPA. *Id.* The Plaintiffs thus asked the Corps to reject the prenotification for NWP treatment for the WWTP and the force main and outfall. Other affected persons tendered similar complaints.

Confronted by this opposition, the Corps began to act as if the County and it had not reached an agreement about the permitting approach on July 14 (and perhaps, in fact, there was no agreement—merely suggestions). For example, on November 9, 1999, Knepper, of the Corps, informed Thomas, of Timmons, that the Corps had "received a letter of opposition that gives an argument why they think *all three components* should be considered as a single project (interceptor + treatment plant + forcemain and outfall)" and that the Chiefs (Corps officials) "will discuss this project at their meeting today and make a decision." R564. The next day, November 10, 1999, Knepper told Thomas that "the chiefs did not meet yesterday" and that the decision (whether to consider all components separately or as one project) would not be made until the chiefs met again on November 16. R569. Knepper also commented: "if you want to write down the reasons why you feel each of the three components should be viewed sepa-

rately, feel free to e-mail it to me and i[sic] will give a copy to each of the chiefs for review." R569.

Then, in an e-mail reply to Knepper also dated November 10, 1999, Frank Harksen, the Director of the Hanover County Department of Public Utilities, wrote:

Following our July 14, 1999 Permit Kickoff Meeting we hosted, I have not been tuned into the day to day activities associated with the permitting effort which is why *your November 9, 1999 message concerning the possible issuance of a single permit for all three (3) projects [WWTP, force main and outfall, and TC Interceptor] came as a surprise. This is a significant change from what we agreed to back in July* but I understand the sensitivity associated with these permits due to the increased attention our applications have received and I can read an organizational chart—clearly Mr. Jones has the final say.

Back during the July meeting we spent the better part of two (2) hours discussing the projects and providing our position *on the independence of each project* and why we felt it was appropriate to permit them separately. *At that time I believe our rationale was sufficient to convince you* that our approach was justified and supportable—*and you offered some permitting alternatives. Since I was not aware the 'single permit possibility' was still under consideration* or that Mr. Ellis had submitted his letter, I have not expended the resources necessary to reduce our presentation to a concise written statement. However, I will certainly *take you up on your offer* to accept our written position statement and will initiate preparation of the document.

R568 (emphasis added). Significantly, that communication did not mention the

Powhite Creek Pump Station alternative to the TC Interceptor. Also, by early November, 1999, the County found itself having to defend its position on what it thought was, as of July 1999, a settled question: the use of NWPs for the WWTP and the force main and outfall separately from the TC Interceptor, the latter to follow the individual permit regime.

### E. The County's Position as of November 30, 1999

Accordingly, on November 30, 1999, Harksen, accepting Knepper's invitation of November 10, submitted the County's position statement to the Corps. R590–94. In that letter, Harksen described the "permitting approach" to which he believed the Corps had agreed at the July 14 meeting, which had led the County formally to request NWP permit verification on August 23 (for the WWTP) and September 28 (for the force main and outfall) R590. The letter also explained why the County had presented all components at the July 14 meeting and set forth the County's belief regarding the outcome of that meeting:

> The County's three projects, the Totopotomoy Wastewater Treatment Plant, the discharge force main and outfall structure, and gravity sewer interceptor were presented to the agencies to provide the "big picture" of the County's plans so that an appropriate permitting plan could be developed for the projects. *Following the presentation, appropriate permitting strategies were discussed and agreed to.* We believe *we have been proceeding with the permitting approach agreed to* at the July meeting.

R590 (emphasis added). The November 30 statement of position also asserts that the phase of the TC Interceptor that is here at issue "is part of a long-term, stand alone project and was planned and started long before the location for the wastewater treatment plant was selected. The con-

cept for the Totopotomoy interceptor appeared in a 1979 report and possibly earlier reports." R592. The letter further states that the final phase of the TC Interceptor will be built without regard to whether the WWTP is built at the proposed site, but the flow currently being sent to Henrico County "would need to be conveyed to wherever additional treatment capacity is made available. The County is proposing that this additional capacity be located at the site of the proposed Totopotomoy Wastewater Treatment Plant, a location that works well with the proposed interceptor." R592.

The County's statement of position makes clear beyond peradventure that, as of November 30, 1999, the TC Interceptor is required to transport sewage to the new WWTP, wherever it might have been located. There was under consideration, at the time, only one possible location of the WWTP, the one at the terminus of the proposed TC Interceptor.

In assessing Harksen's references to the fact that the TC Interceptor was the last phase of the earlier project, it is important to note that, while the precise site of the WWTP may not have been selected in 1979 (the date when the interceptor line that contains the TC Interceptor appeared on the comprehensive plan), a WWTP in the general vicinity of the proposed WWTP had been part of the County's comprehensive plan since 1972. R426. In any event, the County studied alternative WWTP sites, found the current site of the proposed WWTP to be the best, and bought the land for it in 1997. R593. After that, the County began the final planning for the TC Interceptor to connect with a WWTP at that site and had finalized those plans by October 1998.

Harksen's letter also makes clear that, by November 30, 1999, the County was

very anxious about whether the Corps would adhere to the permitting approach the County thought had been settled upon in a private meeting with the Corps. That meeting was held before any member of the public had been given notice of what the County had in mind to assure that it could proceed under the soon-to-expire NWP 26. Remarkably, the Corps did not reply to Harksen that there had not been—in fact could not lawfully have been—any agreement at all on July 14.[7]

Further, it should be noted that Harksen's letter seeks to make the point that the TC Interceptor has independent utility without the WWTP. But, as will be explained later, the issue is whether the WWTP has independent utility without the TC Interceptor. Nothing in Harksen's letter or the record as of November 30, 1999 permits any such conclusion.

### F. The Meeting on January 7, 2000, the Letter of January 14, 2000, and the First Mention of the Powhite Creek Pump Station

On January 7, 2000, another meeting concerning the project was held between the Corps' Jones and Knepper and several representatives of the County. Handwritten notes (by an unidentified author) appear in the record at R728–29. These notes, under the heading of "Sloane," state "plant + outfall -> makes sense to be single, look @ interceptor as separate." R729. It is not clear who took these notes, who made that statement, whether the Corps came to that conclusion, and, if so, why the Corps reached any such conclusion, if that is what it is.

Then, on January 14, 2000, the County submitted, "as a follow up to" the January 7 meeting, a joint pre-notification for the WWTP, force main, and outfall. R739–66.

Specifically, the County sought a verification of the use of NWP 26 for the WWTP, NWP 12 for the force main, and NWP 7 for the outfall. R739. This consolidated pre-notification was tendered "to combine the previously separate permit verification requests" for the WWTP (August 23, 1999) and the force main and outfall (September 28, 1999). R739.

Also on January 14, 2000, Timmons wrote a separate "follow up" letter to the Corps respecting the January 7, 2000 meeting. The cover letter provides "additional information to assist the Corps of Engineers in making a determination as to the 'single and complete' project status for the Totopotomoy Wastewater Treatment Plant, the outfall force main, and the discharge structure." R767. It explains:

As indicated at the meeting, and shown on the enclosed drawing, *there is clearly additional wastewater input to the proposed wastewater treatment plant other than the proposed Totopotomoy interceptor sewer.* The proposed Totopotomoy Wastewater Treatment Plant is being planned to meet the sewage disposal requirements for a large portion of the area referred to as the Suburban Services Area in the County's Comprehensive Plan. A majority of the portion of the Suburban Services Area that will be served by the Totopotomoy Wastewater Treatment Plant is not in the Totopotomoy Interceptor Sewer's drainage basin. *Sewage will be pumped either to the proposed [TC] interceptor sewer for conveyance to the wastewater treatment plant or pumped directly to the wastewater treatment. On the drawing* of the Cold Harbor Service Area, both of these *options are shown for the pump over from the future Powhite Creek Pump Station. As currently planned* by the

---

7. The Corps could lawfully suggest possible approaches to permitting, 33 C.F.R. § 325.1(b), but that is not tantamount to an agreement.

County, *this pump station* [the Powhite Creek Pump Station] will allow Hanover to off load additional flow from Henrico County to the Totopotomoy Wastewater Treatment Plant *in about the year 2017. Although the County is not planning to do so, the Powhite Creek Pump Station and force main could be constructed earlier* if required to convey wastewater directly to the Totopotomoy Wastewater Treatment Plant.

R767–68 (emphasis added).

Thus, it was on January 14, 2000, after the notion of separating the TC Interceptor from the rest of the project was under attack and after the County thought that the Corps might be retrenching from the permit approach supposedly "agreed" on July 14, 1999, that the Powhite Creek Pump Station is mentioned as a source of "wastewater input to the proposed wastewater treatment plant." *Id.* Of greater significance than the belated entry of this "wastewater input" source (to explain why the WWTP has independent utility from the TC Interceptor) is the assertion that the WWTP, which the County needs to be operational by 2003, could receive wastewater from a pump station that is not planned to be operational until 2017.

At oral argument on April 3, 2001, counsel for the Corps explained that the County would not build the Powhite Creek Pump Station until it is necessary to do so to serve the so-called Cold Harbor Service area of the County and there is no plan to do that until 2017. Thus, as counsel for the Corps admitted at oral argument on April 3, if the Powhite Creek Pump Station is a viable alternative source of sewage for the WWTP in 2003, it is not shown in the record.

### G. The Emergence of Independent Utility

In a facsimile dated February 15, 2000 from the Corps to Rod Schwarm of the National Marine Fisheries Service, the Corps' Knepper first addressed the topic of independent utility, saying that "the proposed [Totopotomoy Wastewater Treatment Plant], effluent forcemain, and diffuser outfall are all considered a single and complete project because they have separate utility (tie in with *existing pump stations* )." R790 (emphasis added). However, the record does not identify any existing pump stations (as of February 15, 2000) that are "tied in," or that are planned to be "tied in," by an interceptor line through which the WWTP could receive sewage.

At oral argument on April 3, 2001, counsel for the County identified the existing pump stations to which Knepper was referring as those shown on the maps at R202–03 (Royal Glen, Berkeley Forest, and Avondale pump stations). Although these pump stations do exist, they would need to be linked to each other and to the WWTP by an interceptor in order to transport water to the WWTP. The record does not disclose any such interceptor now in existence or planned for 2003, if ever.

It is also interesting to note that others involved in the regulatory process recognized, from the submissions made to the Corps, that the WWTP, force main and outfall, and the TC Interceptor were all components of a project in which the components were dependent upon one another. For example, by letter dated March 23, 2000, the Virginia Department of Historic Resources, having reviewed the County's plans, expressed the view that:

[t]he wastewater treatment plant, force main, outfall structure, and sewer interceptor *are four components of one project.* Given our current understanding of the Corps involvement, it is reasonable to regard the *proposed activity as*

*one whole and complete project* for purposes of Section 106 of the National Historic Preservation Act.

R809. After a private meeting between it and the Virginia Department of Historic Resources, the County requested the Department to issue a letter retracting the independent assessment quoted above. R824. That letter was issued, but it was sent to Knepper of the Corps for review before the Department issued it. R824–26.

On May 4, 2000, the Corps responded to the March 23 opinion of the Virginia Department of Historic Resources, stating:

In your letter you state that you consider the proposed wastewater treatment plant, force main, outfall structure, and sewer interceptor as four components of one project. You further state that you feel this should be considered a single project for purposes of Section 106 consultation. We disagree. Hanover County (County) has provided our office with information that demonstrates the proposed wastewater treatment plant, force main, and diffuser outfall have separate utility from the proposed sewer interceptor. The County has informed us that the proposed wastewater treatment plant, force main, and diffuser outfall would be constructed even if the proposed sewer interceptor is never permitted and constructed. In a meeting with County representatives on January 07, 2000 and in a letter from Timmons dated January 14, 2000, the project proponents demonstrated the proposed treatment plant, force main and outfall is designed to handle wastewater input from sources other than the proposed Totopotomoy interceptor (e.g., from the proposed Powhite Creek Pump Station). Considering this information, our office has determined the proposed wastewater treatment plant, force main, and dif-

fuser outfall constitute a single and complete project; and the proposed sewer interceptor represents a separate single and complete project.

R838. In sum, in May 2000, the Corps acknowledged that its decision was based on whatever was said in a private meeting between it and the County on January 7, 2000 and on the contents of a letter dated January 14, 2000.

On June 7, 2000, the Corps issued a Memorandum for the Record respecting its authorization of NWPs for the WWTP, force main, and outfall. R864. The explanation for the Corps' decision, in its entirety, follows:

Hanover County has provided our office with information that demonstrates the proposed wastewater treatment plant, force main, and diffuser outfall have separate utility from the proposed sewer interceptor. The County has informed us that these 3 elements would be constructed even if the proposed sewer interceptor is never permitted and constructed. In a meeting with County representatives on January 07, 2000 and in a letter from Timmons dated January 14, 2000, the project proponents demonstrated the proposed treatment plant, force main and outfall is designed to handle wastewater input from sources other than the proposed Totopotomoy interceptor (e.g., from the proposed Powhite Creek Pump Station).

R864. Like the Corps' letter of May 4, 2000, this Memorandum of the Corps' decision was based on the January 7 meeting and the January 14 letter from Timmons. Also, in both letters the Corps' decision identifies the proposed Powhite Creek Pump Station as the only source, other than the TC Interceptor, of sewage for the WWTP. This passage (which appears in both letters) is the only statement in the Corps' official permitting decision about

the relationship of the TC Interceptor to the WWTP, force main, and outfall.

On this record, Crutchfield and Broaddus seek a declaration that the Corps' verification of the NWPs for the outfall, force main, and WWTP, was contrary to law; a declaration that these NWPs are invalid and void; an injunction to prevent the County from proceeding with the WWTP until it receives an individual permit for the complete project; and attorneys fees, costs, and expenses.

## DISCUSSION

### I. Standard of Review

■■ A district court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). Challenges to permitting actions by the Corps on CWA, NEPA and NHPA grounds are all subject to the deferential standard of review set out in the APA. *See Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989) (NEPA); *Morongo Band of Mission Indians v. Fed. Aviation Admin.,* 161 F.3d 569, 573 (9th Cir.1998) (NHPA); *Preserve Endangered Areas of Cobb's History, Inc. v. Corps of Engineers,* 87 F.3d 1242, 1247 (11th Cir.1996) (CWA); *Shoreline Assocs. v. Marsh,* 555 F.Supp. 169, 173 (D.Md. 1983), *aff'd,* 725 F.2d 677 (4th Cir.1984) (same). The party asserting an APA challenge bears the burden of demonstrating that the agency's actions were arbitrary or capricious. *See, e.g., Sierra Club v. Marita,* 46 F.3d 606, 619 (7th Cir.1995).

■■ The scope of this review "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). In order to satisfy this review, "the agency must [have] examine[d] the relevant data and [have] articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (citation omitted). Although the reviewing court cannot supply the reasoned basis for the agency's action, the reviewing court is obligated to " 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Id.* (citation omitted). Thus, the court's "task is to scrutinize the [agency's] activity to determine whether the record reveals that a rational basis exists for its decision." *Natural Res. Defense Council, Inc. v. United States Environmental Protection Agency,* 16 F.3d 1395, 1401 (4th cir.1993). If so, the court must uphold the agency's action. Finally, the agency's decisions are due deference by the judiciary in the interpretation of the statutes that the agency administers, in the interpretation of its own regulations, and in the area of its expertise. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Christensen v. Harris Co.,* 529 U.S. 576, 120 S.Ct. 1655, 1662, 146 L.Ed.2d 621 (2000).

### II. Issues Presented For Review

Broaddus and Crutchfield present three basic issues for judicial review. They are:

(1) Whether the Corps violated the Clean Water Act and its own regulations when it accepted NWP verification requests and later confirmed nationwide permit coverage for discharges associated with construction of the Totopotomoy sewage treatment plant, discharge forcemain, and outfall structure and diffuser, but ignored related activities requiring

Corps authorization associated with the proposed interceptor sewer.

(2) Whether the Corps' action also violated the National Environmental Policy Act when it verified NWPs for portions of this project without preparing an EA or EIS addressing all of the effects of, and alternatives to, the overall project.

(3) Whether the Corps violated the National Historic Preservation Act when it issued NWPs for portions of this project without considering all of the impacts the overall project may have on historic resources.

## III. Analysis

The challenge under each statute will be examined in turn. However, as a practical matter, the analysis under NEPA and NHPA are dependent upon the validity of the Corps' actions under the CWA, so those issues must be addressed first.

### A. The Clean Water Act Issues

The challenge under the CWA implicates two regulations issued by the Corps in respect of duties entrusted to it under the CWA. The Plaintiffs' argument under 33 C.F.R. § 325.1(d)(2) misses the mark. However, their positions respecting the Corps' failure to satisfy 33 C.F.R. § 330.6(d) are well-taken.

#### 1. The "Reasonably Related" Requirement of 33 C.F.R. § 325.1 Does Not Apply to NWPs

The first issue to be addressed under the CWA is whether the Corps violated the requirements of its own regulation, 33 C.F.R. § 325.1(d)(2), respecting the verification of permits by improperly allowing the County to present the joint pre-notification for NWPs for the WWTP, force main and outfall and an individual permit application for the TC Interceptor in different documents, thereby dividing one project of related components into two different projects. Assessment of that issue requires a brief consideration of the Corps' regulations respecting the verification of permits of the sort here at issue.

The objective of Chapter 26 of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) The Secretary of the Army, acting through the Chief of Engineers:

> [i]n carrying out his functions relating to the discharge of dredged or fill material under this section ... may, after notice and opportunity for public hearing, issue general permits on a State, regional, or nationwide basis for any category of activities involving discharges of dredged or fill material if the Secretary determines that the activities in such category are similar in nature, will cause only minimal adverse environmental effects when performed separately, and will have only minimal cumulative adverse effect on the environment.

33 U.S.C. § 1344(e)(1). Under the CWA, the Corps has established two mechanisms to authorize the conduct of activities that affect waters of the United States: individual permits and general permits. *See* 33 C.F.R. § 325.5. The Corps issues individual permits after reviewing applications. "Individual permit" means "a DA authorization that is issued following a case-by-case evaluation of a specific structure or work in accordance with the procedures of this regulation and 33 CFR part 325, and a determination that the proposed structure or work is in the public interest pursuant to 33 CFR part 320." 33 C.F.R. § 322.2(e). The Corps also may issue general permits "that authorize a category or categories of activities in specific geographical regions or nationwide." 33 C.F.R. § 320.1(c); *see also* 33 C.F.R. § 322.2(f).

General permits can be either nationwide, which are issued by the Chief of Engineers through publication in the Federal Register and apply nationwide, or regional, which are issued by district or division engineers and apply only in a given region. 33 C.F.R. § 320 .1(c). Nationwide permits (NWPs), the sort authorized for the County and at issue here, are nationwide general permits that "are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.1(b). At the risk of oversimplification, NWPs are issued to allow conduct of a class of activities that the Corps has studied that, either because of the nature of the activity or the small reach of its impact, have sufficiently minimal impact as to justify bypassing the stricter regulatory review given applications for individual permits.

In contrast, standard individual permits require compliance with "public interest review procedures, including public notice and receipt of comments." 33 C.F.R. § 325.5(b)(1). This public interest review involves an evaluation of "the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work." 33 C.F.R. § 320.4(a)(2)(ii).

Some activities that are authorized by general permits, including NWPs, do not require an application or even prior notification to the Corps before the activity is begun. 33 C.F.R. § 330.1(e). Others require pre-notification before initiating construction, but "[t]he permittee may presume that his project qualifies for the NWP unless he is otherwise notified by the DE within a 30–day period." *Id.; see also* 33 C.F.R. § 320.1(c). In others, "[n]ationwide permittees may, and in some cases must, request from a DE confirmation that an activity complies with the terms and conditions of an NWP." 33

C.F.R. § 330.6(a). Approval of that sort is termed a "verification," *id.,* and it is the Corps' verification of the County's permits that is the subject of this action.

■ That brings us to the first regulation at issue, 33 C.F.R. § 325.1(d)(2), which provides:

> All activities which the applicant plans to undertake which are *reasonably related* to the same project and for which a DA permit would be required should be included in the same permit application. District engineers should reject, as incomplete, any permit application which fails to comply with this requirement.

33 C.F.R. § 325.1(d)(2) (emphasis added). The threshold issue raised by Crutchfield and Broaddus is whether the "reasonably related" requirement in section 325.1(d)(2) applies to NWPs of the sort that, like those here at issue, require pre-notification. For the reasons set forth below, the "reasonably related" requirement does not apply to such NWPs.

Section 325.1 begins by explaining that "[t]he processing procedure of this part apply to *any* Department of the Army (DA) permit. Special procedures and additional information are contained in 33 CFR parts 320 through 324, 327 and part 330. This part is arranged in the basic timing sequence used by the Corps of Engineers in processing applications for DA permits." 33 C.F.R. § 325.1(a) (emphasis added). Although this provision clearly makes section 325.1 applicable to "processing applications" for all permits, it does not govern the verification of NWPs because NWPs do not require applications within the meaning of section 325.1(d). 33 C.F.R. § 320 .1(c). Some NWPs, as is the case here, require what the regulations term "pre-notification" to the Corps of the proposed activity. The procedures for pre-notification are set forth in 33 C.F.R. § 330.1(e), which refers to this require-

ment as "notification" rather than an "application."

The information in section 325.1(c), "Application form," applies to "individual DA permits" and explains that "[c]ertain activities have been authorized by general permits and do not require submission of an application form but may require a separate notification." 33 C.F.R. § 325.1(c). Immediately following, section 325.1(d), which contains the "reasonably related requirement," gives information on the "Content of application." Read in the context of section 325.1 and section 330.1, the "reasonably related" requirement of section 325.1(d) applies only to applications for individual permits, not to notifications of NWPs.[8]

## 2. NWPs Fail Independent Utility Analysis of 33 C.F.R. § 330.6

The Plaintiffs' next challenge to the action of the Corps is that the verification of the NWPs was in violation of 33 C.F.R. § 330.6(d), "Combining nationwide permits with individual permits." That regulation provides:

Subject to the following qualifications, *portions of a larger project may proceed under the authority of the NWPs while the DE evaluates an individual permit application for other portions of the same project, but only if the portions of the project qualifying for NWP authori-*

*zation would have independent utility and are able to function or meet their purpose independent of the total project.* When the functioning or usefulness of a portion of the total project qualifying for an NWP is *dependent on the remainder of the project, such that its construction and use would not be fully justified even if the Corps were to deny the individual permit,* the NWP does not apply and all portions of the project must be evaluated as part of the individual permit process.

33 C.F.R. § 330.6(d) (emphasis added). The regulation further states:

When a portion of a larger project is authorized to proceed under an NWP, it is with the understanding that its construction will in no way prejudice the decision on the individual permit for the rest of the project. Furthermore, the individual permit documentation must include an analysis of the impacts of the entire project, including related activities authorized by NWP.

33 C.F.R. § 330.6(d)(1).

Crutchfield and Broaddus challenge the Corps' decision under this regulation on two grounds. First, they argue that the WWTP, force main, and outfall do not have utility independent of the TC Interceptor, and therefore can be permitted, if at all, only through an individual permit rather than through an NWP.[9] Second,

---

8. It should be noted that, on various occasions, the County termed its requests for verification under the NWPs here at issue as "verifications," "applications," or "joint applications." R424, 463, 498, 739. However, notwithstanding the use of the word "application" as captions for some of its requests for the Corps to allow it to proceed under NWPs 26, 12 and 7, the record establishes that both the Corps and the County were proceeding under the regulations respecting NWPs of the type that require Corps verification which, as explained above, are not governed by the rea-

sonably related requirement of section 325.1(d).

If that requirement were applicable, the Corps' handling of this matter would have violated the reasonably related requirement for the same reasons that the Corps violated the independent utility requirement of section 330.6(d).

9. Of course, if an individual permit is required, then the "reasonably related" requirement of 33 C.F.R. § 325.1 would be applicable. *See supra* section III(A)(1).

Crutchfield and Broaddus argue that the NWPs for the WWTP, force main, and outfall were allowed to proceed before the Corps received an individual permit application for the TC Interceptor, not "while" the Corps evaluated the individual permit application that the County made for the TC Interceptor after the Corps verified the use of NWPs for the WWTP, force main and outfall. Therefore, say the Plaintiffs, even if the WWTP, force main, and outfall had independent utility, they could not lawfully have received NWP verification until the County had submitted an individual permit application for the TC Interceptor. For the reasons set forth below, both arguments are meritorious.[10]

### a. The WWTP, Force Main, and Outfall Lack Utility Independent of the Totopotomoy Creek Interceptor

■ The parties have cited, and research has unearthed, no precedent interpreting the "independent utility" requirement of 33 C.F.R. § 330.6(d). However, the plain text of the regulation, as applied to the record, rather clearly forecloses a rational determination that the WWTP, force main, and outfall have utility independent of the TC Interceptor.

To begin, it is important to note that the regulation requires that the portions of the project sought to be authorized under an NWP (here the WWTP, force main and outfall) be "able to function or meet their purpose independent of the total project." 33 C.F.R. § 330.6(d). The undisputed record here is that the WWTP cannot function at all unless sewage is transported to it by an interceptor. It is also undisputed that the force main and outfall have no

function without the WWTP. Thus, an interceptor is the linchpin of functionality and utility for the WWTP, the force main and the outfall. The record is also undisputed that the WWTP is to be, indeed must be, operational in 2003 to meet the County's wastewater treatment needs. And, the only interceptor even now planned for operation in 2003 is the TC Interceptor.

Nonetheless, the Corps authorized the County to proceed on the WWTP, force main, and outfall under NWPs based on the irrational conclusion that they could function apart from the TC Interceptor and had independent utility because the County's plans showed another interceptor (the Powhite Creek Pump Station line) that could supply sewage to the WWTP when—and if—that interceptor was built in 2017. For several reasons, that decision cannot be considered a rational one supported by the record.

First, that rationale is at odds with the undisputed facts that: (1) according to the County, the WWTP, force main and outfall must be operational in 2003; and (2) the Powhite Creek Pump Station interceptor line is not scheduled to go online until 2017, if then.

Although that schedule might be advanced, the County told the Corps that there is no plan to do so. Moreover, given the County's plan to construct the TC Interceptor, there was, on June 7, 2000, no likelihood of constructing the Powhite Creek Pump Station line until 2017, the earliest date shown in the County's growth projections and planning documents. That, of course, assumes that those growth projects are realized. In sum, the Corps

---

**10.** The County argues that the WWTP, force main, and outfall are a "single and complete project" that can go forward under two or more different NWPs pursuant to 33 C.F.R. § 330.6(c). County's Pre-hearing Memoran- dum at 12–15. This argument fails for the reasons set forth in section III(A)(2)(a) regarding the lack of independent utility of these three components of the project.

reasoned that, during the 14 year period after 2003, the WWTP and the force main and outfall would have independent utility even though, during that period, no sewage whatsoever would be supplied to the WWTP, except through the TC Interceptor. That, of course, also means that, during those 14 years, nothing would be discharged from the WWTP. That reasoning simply is not rational.

Second, that rationale is inconsistent with the record as a whole. The record shows that, for many years, the County's comprehensive plan and its detailed plans for the construction of the WWTP, force main and outfall, all of which are to be operational in 2003, have been premised on the relationship between the WWTP and the TC Interceptor. Not one mention of transporting sewage to the WWTP by the Powhite line appears in the record until January 14, 2000, after opposition to the permitting approached here at issue was made by Crutchfield, Broaddus and others. R767–68. That alternative was not even mentioned in July 1999 when the County and the Corps appear to have perceived the need to segment the TC Interceptor from the rest of the project in an effort to qualify as much of the project as possible under the NWP program. Nor was it mentioned at any time throughout the permitting adjustments made in the fall once the Plaintiffs had learned of the permitting approach and then opposed it.

Of course, the mere fact that the TC Interceptor has been the long-planned means of conferring functionality and utility upon the WWTP does not mean that no other alternative could achieve those ends. However, the County's long-standing reliance on the TC Interceptor and the fact that it is part of the County's comprehensive plan and has been the subject of detailed design as the mode of sewage transport to the WWTP renders incredible the

belated resort to the theory that the Powhite line could be the basis for a rational conclusion of independent utility. The Corps' determination is, on this record, shown to be a belated contrivance of expediency.

The irrationality of pinning the independent utility finding on the Powhite line is further illustrated by the sequence of events leading to the Corps' determination. Specifically, in July 1999, neither the Corps nor the County approached the permitting analysis by considering independent utility. Rather, both looked at whether the projects could be separated; and that approach was driven by the fact that the Corps told the County that the TC Interceptor, which had a more than minimal impact, could not proceed under an NWP.

Then, in an effort to prove separateness, the County offered—in the Harksen letter of November 30—a justification that tended to show that the TC Interceptor had independent utility from the WWTP, not vice versa as the regulation requires. 33 C.F.R. § 360.6(d) (emphasis added) (portions of a larger project may proceed under NWPs "*only if the portions of the project qualifying for NWP authorization* would have independent utility and are able to function or meet their purpose independent of the total project"). For reasons neither expressed nor readily apparent, the separateness approach was abandoned in January 2000 and the independent utility approach surfaced for the first time. Only then did the County mention the Powhite Creek Pump Station.

Third, the Corps' determination is at odds with reality. Specifically, it is undisputed that the County actually intends to build the TC Interceptor by 2003 as the means of providing sewage to the WWTP when it becomes operational. The record shows that, at all times after July 14, the

County intended to apply for a permit for the TC Interceptor shortly after the NWPs for the WWTP, force main and outfall were verified by the Corps. Although not part of the administrative record in this action, according to Plaintiffs, the Corps received the County's individual permit application for the TC Interceptor on July 17, 2000, shortly after the Corps verified NWPs for the other components of the sewage system on June 7, 2000. Plaintiff's Pre-hearing Memorandum at 13–14. That is not disputed by the County.

All of that was known to the Corps when it based its independent utility determination for those components on the fact that the Powhite line was to be built in 17 years. These facts of record further illustrate that the Corps' independent utility finding is an expedient adopted by the Corps at the urging of the County largely because NWP 26 was on the verge of expiring, and, as the record shows, the County urgently needed to take advantage of it.

That conclusion is underscored by the evolution of the permitting process from shortly after the Pre–Application Package was filed on June 3, 1999. In fact, the Corps appears to have had doubts from as early as June 1999 that the NWP process would be available to the project as the County had planned. The reason is obvious. The TC Interceptor was foreseen to have more than minimal impacts which, of course, would foreclose use of NWPs for the entire project. Thus, another approach had to be devised. The County and the Corps settled on the idea of separating the projects, apparently in July

1999 (or so the County thought). Crutchfield and Broaddus found out about this plan and complained that the WWTP, force main and outfall could not be logically or legally separate from the source of supply—the TC Interceptor for which at the time there was no proposed alternative. Broaddus and Crutchfield then formally objected to the piecemealing.

There then arose a need to find an alternative method of transporting wastewater to the WWTP. For reasons neither expressed nor readily apparent, the County posited the Powhite line in an undocumented meeting on January 7, 2000 and in a letter dated January 14, 2000. Citing that, and only that, as its basis, the Corps made its finding of independent utility. R864, Memorandum for the Record ("the project proponents have demonstrated the proposed treatment plant, force main, and outfall is designed to handle wastewater input from sources other than the proposed Totopotomoy interceptor (e.g., from the proposed Powhite Creek Pump Station)").[11]

Significantly, however, in February 2000, the Corps authored a document that shows that its decision in January was wrong. Specifically, on February 15, 2000, the Corps told another federal agency that "[t]he proposed [WWTP], effluent force-main and diffuser outfall are all considered a single and complete project because they have separate utility (*tie in with existing pump stations* )." R790 (emphasis added). There is, in the record, no support for such a finding, given that the WWTP was not "tied in" with existing pump stations and that there were no plans to build the Powhite Pump Station line until 2017. Al-

---

11. Interestingly enough, three months later, a state agency, the Virginia Department of Historic Preservation, reached the conclusion that this was a single project with four components, but that agency was backed off that

conclusion as a result of the joint activity of the County and the Corps. But, the die had been cast in January insofar as the Corps was concerned, and it could not brook a different conclusion by a different agency.

though the County stated that it could construct the Powhite Creek Pump Station earlier, the administrative record contains no indication that the County planned to accelerate construction of the Powhite Creek Pump Station or, if the County did, how early the Powhite Creek Pump Station could be operational. The County did not represent that the Powhite Creek Pump Station could be constructed early enough for the WWTP to be operational by 2003, or even soon thereafter. Thus, the February 15 document illustrated that the factual predicate for the Corps' independent utility determination (based on the January 7 meeting and the January 14 letter) was incorrect.

However, by May 4, 2000, in its response to the Virginia Department of Historic Resources, the Corps took the view that independent utility was supplied by the Powhite Creek Pump Station, which was not planned to be operational for 17 years. R838. The Corps' June 7 Memorandum of Record takes the same tack. R864.

Fourth, the Corps' determination that the WWTP, force main and outfall have independent utility from the TC Interceptor suffers from another infirmity. Specifically, that determination is not supported by articulated reasoning for the Corps' conclusion that the Powhite Creek Pump Station, which is not to be built until 2017, can be the source of supply for the WWTP, which must be operational in 2003.

According to the record, that critical determination was made by the Corps because, in a meeting on January 7 and in a letter on January 14, the County "demonstrated the proposed treatment plant, force main and outfall is designed to handle wastewater input from sources other than the proposed Totopotomoy interceptor (e.g. from the proposed Powhite Creek Pump Station)." R864. However, nowhere

does the Corps explain how that "demonstration" took place or what the Corps relied on in making the remarkably illogical conclusion that a sewage treatment plant to be operational in 2003 could derive independent utility from a source of supply to be built in 2017, if then.

It is axiomatic that the Corps is obligated to provide reasoning to support its determination of independent utility. That is especially important where, as here, the determination is, on its face, of doubtful rationality. Of course, the Court is obligated to uphold " 'a decision of less than ideal clarity if the agency's path may reasonably be discerned,' " *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43, 103 S.Ct. 2856, but that precept does not apply here because the Corps' decisional path is not discernable.

For example, how and why did the Corps surmount the illogic of a rationale that is so facially illogical? Did the Corps consider that independent utility is, under its regulation determined, solely by looking at the project's design and ignoring the rest of the record on the critical connectivity between the TC Interceptor and the WWTP that must be operational in 2003. These are but two issues that call out for explanation. But, the Corps has given none.

The need for agency explanation is especially important considering that nothing in the record discloses what was said on the critical topic at the January 7 meeting except the terse notation made by an unknown author and that the January 14 letter is itself an irrational explanation of independent utility (confessing, as it does, that there are no plans to build the putative alternate source of supply until 2017).

The articulation of the Corps' reasoning is of utmost importance particularly in the process followed by the Corps which en-

courages private resolution of the details respecting matters of public importance. Of course, that process is not challenged here and it appears to be consistent with a well-publicized regulatory program. Nonetheless, the regulated party and the regulator are not the only interested parties in respect of these decisions. Thus, if what is said behind closed doors is convincing to the regulator, it is obliged to set forth clearly and cogently its reasoning when it makes its decision public. Nowhere is that more important than where, as here, the logic of the decision is so difficult to discern and where the decision is such a drastic departure from long-standing plans and from reality.

Under these circumstances, the agency must articulate why it has made its decision with sufficient clarity that others affected by the decision and the Courts can understand it. The Corps has not done that and its determination of independent utility cannot stand for that additional reason.

Finally, the so-called "capacity" argument made by the Corps and the County is unpersuasive. According to that theory, the WWTP is planned so that its capacity can be expanded from 5 mgd to 30 mgd if required, while the TC Interceptor was "designed with a nominal capacity of approximately 15 mgd." R426–27. Thus, ultimately, the capacity of the WWTP may exceed the capacity of the TC Interceptor. Hence, say the County and the Corps, the WWTP has utility independent of the TC Interceptor.

This argument for ascribing independent utility to the WWTP, force main, and outfall fails in the first instance because it was not a reason given by the Corps for its determination. Hence, it is a classic post-hoc rationalization of counsel which pro-vides no ground for supporting the agency's decision.

Moreover, it does not logically support the agency's determination, even if it could be ascribed to the agency. While the WWTP may theoretically be capable of handling wastewater input from other sources, that fact alone does not give the WWTP, force main, and outfall independent utility at the time of verification of the NWPs. First, the initial capacity of the WWTP is smaller than that of the TC Interceptor, and its capacity may never be increased to 30 mgd. Second, designing the WWTP to receive sewage from other sources does not give it independent utility at the outset when there is no concrete plan to utilize other sources of transport in the near future, if at all. Hence, the argument that the WWTP is designed to handle sewage from sources other than the TC Interceptor also fails.

For the reasons explained above, the Corps' finding of independent utility is not a rational one. It cannot withstand even the deferential review to which it is entitled.

This result, based on application of the plain text of section 330.6(d) to the record, is supported by decisions which address analogous issues under other statutes. These cases address "segmenting" or "piecemealing," which refer to "an attempt by an agency to divide artificially a 'major Federal action' into smaller components to escape the application of NEPA to some of its segments." *Save Barton Creek Ass'n v. Fed. Highway Admin.*, 950 F.2d 1129, 1140 (5th Cir.1992). Case law on improper segmentation "almost always involves a situation where a 'major Federal action' is found to exist and *then* the segmentation is evaluated as an escape from NEPA application which is otherwise immediate."[12] *Id.* at 1139.

---

**12.** Segmentation and the scope of a project are threads that run throughout NEPA, CWA,

In an unpublished opinion, the Fourth Circuit addressed a NEPA claim regarding an EIS for a highway, a portion of which was to serve as a research and testing subject for Intelligent Transportation Systems. In it, the Fourth Circuit explained how to identify segmentation:

The hallmarks of segmentation are where the proposed component action has *little or no independent utility* or involves such a large and irretrievable commitment of resources that it may virtually force a larger or related project to go forward notwithstanding the environmental consequences.

*New River Valley Greens v. United States Dep't of Transp.*, 161 F.3d 3, 1998 WL 633959, *3 (4th Cir.1998) (unpublished opinion) (emphasis added).

Cases involving highways provide helpful analogies to this project. In fact, the County pressed the use of such analogies at oral argument. The analysis of Fourth Circuit precedent respecting highways and the distinctions between highways and the wastewater treatment project lead to the conclusion that the TC Interceptor was improperly segmented from the rest of the project.[13] The critical distinction between this sewage treatment project and connecting highways is that the WWTP has no source of water for 14 years without the TC Interceptor, while highways that physically connect nevertheless have sources of traffic other than any given highway to which they connect.

For example, the Fourth Circuit was faced with the issue of whether I–195 and the Downtown Expressway in Richmond, Virginia, were one project in a challenge to their construction under NEPA, NHPA, and the Federal–Aid Highways Act. The district court opinion, on the basis of which the Fourth Circuit affirmed the district court's decision, looked to:

a multitude of factors, including the manner in which the roads were planned, their geographic locations, and the utility of each in the absence of the other. Any acts of the defendants that suggest that they may have decided to treat the roads separately in order to avoid the requirements of federal law will weigh very heavily in support of the project splitting theory. As to weighing the utility of each road in the absence of the other, the Court notes that it does not sit as a traffic expert to determine when one will be efficient if the other is not built. However, if the Court concludes that the two highways each have such little value in their own right that their separate construction could be considered arbitrary or irrational, the Court will find them to be a single project.

*James River v. Richmond Metro. Auth.*, 359 F.Supp. 611, 635 (E.D.Va.1973), *aff'd*

---

and NHPA regulations. For example, CWA regulations addressing compliance with NEPA recognize:

In some situations, a permit applicant may propose to conduct a specific activity requiring a Department of the Army (DA) permit (e.g., construction of a pier in a navigable water of the United States) which is merely one component of a larger project (e.g., construction of an oil refinery on an upland area). The district engineer should establish the scope of the NEPA document (e.g., the EA or EIS) to address the impacts of the specific activity requiring a DA per-

mit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review.

33 C.F.R. § 325, Appendix B(7)(b).

**13.** *See also Save Barton Creek Ass'n*, 950 F.2d 1129 (finding southern extension of a north-south freeway and a southwest corridor of circumferential freeway had independent utility because each served a significant purpose even if the other was not built, distinguishing precedent in which one segment could not be utilized if the other was not built).

481 F.2d 1280 (4th Cir.1973). The Court of Appeals found that the two highways reflected "both geographic differences and varying traffic needs," even though they were designed with the other in mind to maximize efficiency. *Id.* Moreover, each "serve rational needs in their own rights, apart from traffic feeding from one another." *Id.*

In this case, the WWTP, force main, and outfall serve no rational need in their own right without the TC Interceptor. Although the County has pointed to the proposed Powhite Creek Pump Station line as an alternative source of wastewater, there is nothing in the record to explain how construction of the WWTP is rational if it were to have no source of water until 2017, when the County has decried for years that the WWTP needs to be operational by 2003. The facts of this action are closer to an "unusual situation" in which roads are so interrelated that they would be treated as one highway:

> In some situations the relationship of several roads or parts of road may be so interrelated that no one road or part of a road can function as an efficient carrier of motor vehicles except in conjunction with the others. In such a case, it is possible that it would be necessary to have an EIS which would have as its subject all of the roads or parts of roads which could only function efficiently as a unit. In such an unusual situation, the several roads would not constitute a system of highways but would be treated essentially as a single highway for the purpose of the EIS.

*Movement Against Destruction v. Volpe,* 361 F.Supp. 1360, 1384 (D.Md.1973), *aff'd* 500 F.2d 29 (4th Cir.1974).

The County analogizes the WWTP, force main, and outfall to the circumferential highway around Washington, D.C., I–495, which it argues has utility independent of the major interstate highways that intersect it. I–495 clearly has independent utility because it serves to carry traffic around Washington, D.C., not just onto major interstate highways that leave the Washington area. But the WWTP, force main, and outfall are analogous to a circumferential highway that has no entry ramps, so that no vehicles can travel it unless entry ramps are constructed.

The proper highway analogy to the sewage treatment project at issue here is a highway that had no source of traffic for 14 years after it is built without the construction of the other road that is alleged to have been segmented from it. The Corps and the County have cited no such analogous case. Rather, they rely on the proposed Powhite Creek Pump Station, which is slated to be operational in 2017, to give the WWTP, force main, and outfall independent utility. Reliance on this source of wastewater for the WWTP does not make this case analogous to roads that have an immediate or impending source of traffic other than the road that is allegedly segmented.

The Corps cites *Northwest Resource Information Center, Inc. v. National Marine Fisheries Service,* 56 F.3d 1060 (9th Cir. 1995), for the proposition that proposed actions are not necessarily interdependent because one would maximize the benefits of the other. Pre-hearing Memorandum of Corps at 21. That argument misstates the relationship between the WWTP and TC Interceptor. In *Northwest Resource Information Center,* the Ninth Circuit gleaned principles on "connected actions" from its precedents. *See also Wetlands Action Network v. United States Army Corps of Eng'rs,* 222 F.3d 1105 (9th Cir. 2000). As the court explained, it has found that two actions are inextricably intertwined when, in the context of a road to facilitate logging, " 'timber sales cannot

proceed without the road, and the road would not be built but for the contemplated timber sales.'" *Northwest Res. Info. Ctr.*, 56 F.3d at 1068, citing *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir.1985). In contrast, when a golf course and proposed resort could exist without each other, although each would be enhanced by the other, they were not connected within the meaning of NEPA regulations. *Id.*, citing *Sylvester v. United States Army Corps of Eng'rs*, 884 F.2d 394, 400 (9th Cir.1989). The Ninth Circuit concluded that "only when '[t]he dependency is such that it would be irrational, or at least unwise, to undertake the first phase if subsequent phases were not also undertaken[']" are the actions connected. *Id.*, citing *Trout Unlimited v. Morton*, 509 F.2d 1276, 1285 (9th Cir.1974). In this case, it is more than an understatement—it would be inaccurate—to say that the TC Interceptor and WWTP will enhance or maximize each other's benefit. Rather, the WWTP simply could not function at all in the County's time frame without the TC Interceptor. The WWTP will have no benefit for 14 years without the TC Interceptor, and the Corps has not articulated why it is not irrational, or at least unwise, to construct the WWTP without the TC Interceptor.

For the foregoing reasons, the WWTP and the associated force main and outfall are not "able to function or meet their purpose independent of the total project[,]" which, since the 1970s, has included the TC Interceptor. 33 C.F.R. § 330.6(d). The "functioning or usefulness" of the WWTP, force main, and outfall are "dependent on the remainder of the project," the TC Interceptor, "such that [their] construction and use would not be fully justified even if the Corps were to deny the individual permit." 33 C.F.R. 330.6(d). The Corps' decision to the contrary is arbitrary, capricious and not in accordance with law.

### b. NWPs Fail Because They Were Not Verified While the Corps Evaluated An Individual Permit Application For the Interceptor

33 C.F.R. § 330.6(d) allows portions of a project having independent utility to proceed under an NWP while the Corps evaluates an individual permit application for the other portions of the project. At the time the Corps made its decision to verify the WWTP, force main and outfall under NWPs, the County had not submitted an individual permit application for the TC Interceptor, even though that interceptor was included in the pre-application package. Thus, even if the WWTP, force main, and outfall have independent utility, Crutchfield and Broaddus argue, the NWPs were not verified by the Corps "while the DE evaluate[d] an individual permit application" for the TC Interceptor. The Corps argues that "while" simply means "prior to the Corps' final decision on the related individual permit application." Pre-hearing Memorandum of Corps at 24. Both the Corps and the County argue that any violation of the "while" requirement was harmless error because the Corps had information about the TC Interceptor, although no formal application had been made. *Id.* at 25; Pre-hearing Memorandum of County at 18–19. Significantly, neither the Corps nor the County argue that the "while" requirement was not violated because the WWTP, force main, and outfall are not a portion of a project that included the TC Interceptor.

■■■ The Corps relies on its explanation of this regulation contained in the Federal Register:

There are many situations where a portion of an overall project that only involves adverse environmental effects

covered by an NWP would be built (i.e., have independent utility) with or without associated activities that may require an individual permit. In such cases, it would be inequitable to delay a decision on the NWP pending a decision on the individual permit.

56 Fed.Reg. 59,110, 59,117 (Nov. 22, 1991). This passage does not re-write, or give the Corps the authority to re-write, the term "while" to be "prior to the Corps' final decision on the related individual permit application." The Corps and the County concede that the Corps verified the NWPs before the County even submitted an individual permit application for the TC Interceptor, and, by a plain reading of the text of the regulation, the Corps failed to comply with it. Moreover, the statement cited to mitigate this failure, that it would be inequitable to delay an NWP decision, is qualified by the phrase "in such cases," i.e., when that portion of the project has independent utility from the subject of the individual permit application. Because, as determined above, the WWTP, force main, and outfall do not have independent utility from the TC Interceptor, verification of the NWPs was not harmless error.

### B. National Environmental Policy Act (NEPA) and National Historic Preservation Act (NHPA)

The preceding independent utility analysis demonstrates that the Corps erred in its application of 33 C.F.R. § 330.6(d) to the verification of NWPs for the WWTP, force main, and outfall. As a result, the Corps did not reach the analyses required under NEPA and NHPA.

#### 1. NEPA

Under NEPA, all federal agencies shall: include in every recommendation or report on … *major Federal actions significantly affecting the quality of the human environment*, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(C). The term "significantly" "requires considerations of both context and intensity." 40 C.F.R. § 1508.27. This includes:

Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it into small component parts.

40 C.F.R. § 1508.27(b)(7).

■ The Corps did not consider the TC Interceptor in determining whether an environmental assessment or environmental impact statement were required by NEPA and, as a result, apparently found that the WWTP, force main, and outfall were not a "major federal action." [14] On remand, the

---

**14.** The Corps conducts the environmental analysis required under NEPA for NWPs prior to the issuance of the NWP in the Federal Register, rather than in connection with verification of NWPs for a given project. R876–

Corps must consider whether the entire wastewater treatment system, including the WWTP, force main, outfall, and TC Interceptor, are a "major federal action," and, if so, fulfill the requirements of NEPA and its implementing regulations.

## 2. NHPA

Under the NHPA:

the head of any Federal department or independent agency having authority to license any undertaking shall, ... prior to the issuance of any license, ... take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under part B of this subchapter a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470f. "No activity which may affect properties listed or properties eligible for listing in the National Register of Historic Places [ ] is authorized" under an NWP until the procedural provisions of 33 C.F.R. § 325, Appendix C, are satisfied. 33 C.F.R. § 330.4(g).

Under NHPA regulations, an agency official responsible for NEPA compliance must determine the area of potential effects of the undertaking and then take a series of steps to gather information on that area and evaluate whether the undertaking has an adverse impact on historical properties in it. 36 C.F.R. § 804.4(a). The "area of potential effects" is defined as follows:

the geographic area or areas within which an undertaking may directly or indirectly cause changes in the character or use of historic properties, if any such

properties exist. The area of potential effects is influenced by the scale and nature of an undertaking and may be different for different kinds of effects caused by the undertaking.

36 C.F.R. § 800.16(d).

 Because the TC Interceptor was not considered with the rest of the wastewater treatment project, the agency official did not consider the associated TC Interceptor in determining the "area of potential effects" of the verification of the NWPs. The Virginia Department of Historic Resources initially regarded the TC Interceptor as part of the same project for purposes of NHPA, but, after consultation with the County and correspondence from the Corps, treated the interceptor as separate from the remainder of the project for NHPA purposes. R809–11, 824–26, 838–42, 860–61. As a result, the determination of "the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" could not be properly made because the TC Interceptor was not considered part of the "undertaking." 16 U.S.C. § 470f. The Corps must now make that determination.

## CONCLUSION

A review of the administrative record, applicable regulations, and decisional law lead to the conclusion that the authorization of NWPs for the WWTP, force main, and outfall by the Corps is arbitrary, capricious, and not in accordance with the law. The Corps "entirely failed to consider an important aspect of the problem," which is how the WWTP, force main, and outfall have utility independent from the TC Interceptor if they cannot be operational until 2017 without the TC Interceptor when the County has stated it requires

77, copy of 61 Fed.Reg. 65,874, 65,878–79 (Dec. 13, 1996).

them to be operational by 2003. *State Farm Mut. Auto. Ins. Co.,* 463 U.S. at 43, 103 S.Ct. 2856. The explanation for Corps' decision, that the WWTP has a source for wastewater other than the TC Interceptor, "runs counter to the evidence before the agency," which is that the WWTP would not be operational until 14 years after it was required (and planned) to be if the alternate Powhite Creek line is regarded as the sewage transport option. There is no rational basis for the Corps' explanation evident from the administrative record. *Id.*

■ The Corps is not required to conduct its own studies, *Friends of the Earth v. Hintz,* 800 F.2d 822, 834–35 (9th Cir. 1986), and need not make extensive findings of fact in connection with verification of NWPs, *Orleans Audubon Society v. Lee,* 742 F.2d 901, 909–10 (5th Cir.1984). However, the agency must nevertheless independently evaluate information and "may not reflexively rubber stamp a statement prepared by others," *Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 642 (5th Cir.1983), such as the statement that the WWTP, force main, and outfall have utility independent from the TC Interceptor.

For the foregoing reasons, the action of the Corps of Engineers verifying NWPs for the WWTP, force main, and outfall is set aside as arbitrary, capricious and not in accordance with law.

The Plaintiffs have asked for injunctive relief and attorneys' fees. The parties shall confer forthwith on the form of an order of injunction consistent with the requirements of this opinion and shall tender an agreed order by August 23, 2001 or shall, by that date, file memoranda explaining, with authority, their respective positions on the scope and wording of an injunction. Any replies shall be filed by August 27, 2001.

The Plaintiffs shall file a thoroughly documented application for attorneys' fees by September 4, 2001. The Defendants shall file a response by September 24, 2001 and the Plaintiffs shall file a reply by October 1, 2001.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.