Frances Broaddus **CRUTCHFIELD** and Henry Ruffin **Broaddus, Plaintiffs**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS and County of Hanover, Virginia, Defendants.**

**Civ. A. No. 3:00CV525.**

United States District Court, E.D. Virginia, Richmond Division.

Dec. 12, 2001.

See also 154 F.Supp. 2d 878.

William B. Ellis, Esquire, Benjamin A. Thorp, IV, Esquire, Ellis & Thorp, PLLC, Richmond, VA, for Plaintiffs.

Sterling E. Rives, III, Esquire, Barbara M. Rose, Esquire, Yvonne S. Wellford, Esquire, County Attorney's Office, Hanover, VA, William G. Broaddus, Esquire, Robert M. Tyler, Esquire, Stewart T. Leeth, Esquire, McGuire Woods LLP, Richmond, VA, for Hanover Co.

G. Scott Williams, Esquire, United States Department of Justice, Environmental and Natural Resources Division, Environmental Defense Section, Washington, DC, Katherine D. Will, Esquire, United States Army Corps of Engineers, Norfolk District, Norfolk, VA, for U.S. Corps of Engineers.

## MEMORANDUM OPINION

PAYNE, District Judge.

This case arises out of the actions taken by the County of Hanover, Virginia (the "County") and the United States Army Corps of Engineers (the "Corps") in connection with the County's attempts to meet its growing need for wastewater treatment capacity. Under the circumstances outlined fully in a Memorandum Opinion issued on August 14, 2001 (the "August 14 Opinion"), the County planned, and began construction of, a wastewater treatment project, several aspects of which required

authorization (in the form of "verifications") by the Corps. For the reasons set forth in the August 14 Opinion, the verifications given by the Corps were set aside as arbitrary, capricious, and not in accordance with law.[1] *See Crutchfield v. United States Army Corps of Engineers*, 154 F.Supp.2d 878, 906 (E.D.Va.2001). The matter was remanded to the Corps so that it could consider "whether the entire wastewater treatment system ... [is] a "major federal action," and if so, then to fulfill the requirements of NEPA[,] implementing regulations [and NHPA and its implementing regulations.]" *Id.* at 904–05.

Thereafter, the parties argued, and adduced evidence respecting, whether injunctive relief was necessary pending completion of the tasks with which the August 14 Opinion charged the Corps on remand. As explained fully in a Memorandum Opinion issued on November 2, 2001 (the "Injunction Opinion"), and in perspective of both the factual record as the parties had presented it and the relevant legal principles, the Court determined that injunctive relief was appropriate. *See Crutchfield v. United States Army Corps of Engineers*, Civil Action No. 3:00cv525 (E.D.Va. November 2, 2001). Therefore, by order accompanying the Injunction Opinion, the County was enjoined from continuing construction on any and all aspects of its planned wastewater treatment project until such time as the Corps properly and fully discharged its statutory responsibilities.

The County timely appealed the judgments implementing the August 14 and Injunction Opinions. The County voluntarily dismissed those appeals and now has moved, pursuant to Fed.R.Civ.P. 60(b)(5)

and (6), for dissolution of the injunction because, according to the County, the circumstances underlying issuance thereof have changed dramatically since November 2.

## STATEMENT OF FACTS

### A. General Background

The August 14 and Injunction Opinions set forth in detail the history of this litigation, including the County's need for increased wastewater treatment capacity, the role of the Corps in authorizing construction of the County's proposed wastewater treatment project (the "project"), and the circumstances necessitating the injunction that the County now asks to be dissolved. Those opinions are incorporated here in the interests of brevity and completeness. Nevertheless, it is useful briefly to outline the facts that are most salient to the County's motion to dissolve the injunction.

Many years ago, the County recognized its growing wastewater treatment needs and began to plan the project that was the subject of the August 14 and the Injunction Opinions. Those plans required construction of a project consisting of several components: a wastewater treatment plant (the "WWTP"); an interceptor pipeline generally following the route of the Totopotomoy Creek (the "TC Interceptor") which would deliver wastewater to the WWTP; a force main which would take the treated wastewater away from the WWTP to a discharge point; and an outfall/diffuser which would discharge the treated wastewater into the Pamunkey River. The project, when completed, would reduce the County's dependency on

---

**1.** The August 14 Opinion held that, in addition to acting in violation of § 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq.*, the Corps' decision-making process violated (1) the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.;* (2) the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.;* and (3) the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.*

surrounding jurisdictions for wastewater treatment.[2] The construction and operation of the wastewater treatment project are integral to the County's ability to meet its goals under its "Comprehensive Plan," the purpose of which is to help the County manage population growth and expansion in an orderly manner. Pursuant to the Comprehensive Plan, growth and the public resources necessary to sustain that growth are systematically directed into the "Suburban Service Area" in order to preserve the rural character of the remainder of the County.[3]

Because construction on the proposed project implicated several federal environmental statutes and regulations, the County was required to secure appropriate permits from the federal government (in this case, from the Corps). In particular, the Corps was called upon to decide: whether and what type of permit could issue, pursuant to the CWA and related regulations;[4] and whether to authorize the dredging and destruction of certain wetlands existing on land committed to the project. The Corps' permitting decisions involved: (1) making certain evaluations under the CWA and other environmental laws; and (2) deciding whether to require certain kinds of permits which, in turn, gave rise to the obligation to conduct addi-

2. At the present time, the County meets its demand for wastewater treatment capacity principally through a contractual arrangement (the "contract") with neighboring Henrico County, Virginia ("Henrico"). The contract limits the amount of wastewater that the County may divert into Henrico's treatment facilities to 5.4 million gallons per day. The County measures the amount of wastewater being diverted under the contract by calculating a 90–day rolling average. For one three month period in 1998, the County diverted approximately 4.5 million gallons per day (as measured by the peak rolling average experienced during that time period) pursuant to the contract. This 4.5 million gallons figure appears to be the highest peak rolling average that the County has experienced under the contract. In 1999, this figure decreased to approximately 3.62 million gallons per day. The evidence is that, in 2000, the peak rolling average increased from the 1999 figure and, as of the December 4, 2001 hearing respecting the County's motion to dissolve the injunction, the most recent peak rolling average was approximately 3.88 million gallons of wastewater per day (as measured in the spring of 2001).

The evidence also indicates that fluctuations in the amount of capacity used under the contract depend, in part, on weather patterns. For example, 1998 (the year in which the County experienced the 4.5 million gallons per day peak) was an unusually rainy year; the 60% above normal rainfall correlated with an approximately 27% increase in use under the contract that year. Since 1998, however, annual rainfall measurements have been below average and the average of the peaks that have been measured under the contract is 4 million gallons of wastewater per day (or approximately 74% of the contracted capacity). This means that, since 1998, 26% of the contracted capacity has remained unused. The County has expressed a concern that annual rainfall comparable to that which the County experienced in 1998 might bring the County perilously close to exceeding its contractual limit. It is undisputed that rainfall in 2002 comparable to that which occurred in 1998 might necessitate the County's use of up to approximately 5 million gallons of wastewater capacity per day under the contract. It is also undisputed, however, that such estimates and predictions are for the most part speculative.

3. The Comprehensive Plan takes effect in phases. The 1997–2002 phase of the plan is currently underway and the County anticipates that additional growth will occur in 2002. Thus, the County considers that it will need additional sewage treatment capacity by early 2003.

4. The specific statutory provisions and implementing regulations animating and involved in the permit requirement are as follows: (1) 33 U.S.C. §§ 1251(a) and 1344(e)(1); (2) 33 C.F.R. §§ 320, et seq.; (3) 42 U.S.C. § 4332(C); (4) 40 C.F.R. § 1508.27; (5) 16 U.S.C. § 470f; (6) 33 C.F.R. §§ 330.4 et seq.; and (7) 36 C.F.R. § 800 et seq.

tional evaluations pursuant to NEPA and NHPA.

On August 8, 2000, Plaintiffs filed a Complaint challenging the Corps' June 7, 2000 decision verifying that, under three Nationwide Permits ("NWPs"), the County could proceed with construction of the WWTP, the force main and the outfall/diffuser components of the project while the Corps considered whether to issue a different kind of permit (an "individual permit") for the TC Interceptor. Plaintiffs alleged that the Corps had violated applicable provisions of the CWA, NEPA, and NHPA. Pursuant to the APA, Plaintiffs sought a declaration that the Corps' verification of NWPs was contrary to law. They also sought injunctive relief to stop construction of the project until there was compliance with the applicable federal environmental statutes.

The August 14 Opinion discusses in detail the specific questions with which the Corps was faced when considering the County's permit application, the process by which the Corps arrived at its eventual decisions, and the parties' legal contentions respecting those decisions. The August 14 Opinion articulated, *inter alia*, that the Corps, at the urging of the County, had arrived at a legally erroneous and "remarkably illogical conclusion" respecting whether the WWTP, the force main, and the outfall/diffuser had "independent utility" from the TC Interceptor, a determination that allowed construction of those three components of the project to proceed under authority of NWPs while the Corps considered whether to issue an individual permit for construction of the TC Interceptor. *See Crutchfield,* 154 F.Supp.2d at 895–903; 33 C.F.R. § 330.6(d). A consequence of that flawed decision was that the Corps did not conduct the requisite environmental assessments of the project as a whole that otherwise would have been required under the CWA, NEPA and the

NHPA. *See id.* at 904. Therefore, and as explained in the August 14 Opinion, the Corps' decision to verify use of the NWPs for certain aspects of the project was set aside and the matter was remanded to the Corps for further consideration in accordance with the applicable federal statutes. The County noticed its appeal from the judgment order implementing the August 14 Opinion.

Thereafter, Plaintiffs moved for entry of an injunction to prevent the County from continuing construction on any aspect of the project pending the Corps' review on remand. The purpose of that injunction, Plaintiffs argued, was to preserve the status quo. *See Crutchfield v. United States Army Corps of Engineers,* Civil Action No. 3:00cv525, at 23–24 (E.D.Va. November 2, 2001). Specifically, Plaintiffs sought to ensure that the Corps' decisions following remand would be made objectively and free from the pressure that necessarily would exist if continued construction and completion of the project (with the attendant expenditure of public resources) occurred before, or during, completion of the regulatory decisional process that was to ensue remand.

As discussed at length in the Injunction Opinion, decisions of the United States Court of Appeals for the Fourth Circuit, as well as other courts, have recognized the need to prevent the sort of improper influence from which Plaintiffs sought to insulate the Corps' decisional process following remand. *See id.* at 23–31. The County argued, in part, that Plaintiffs' concern was illusory because the only aspect of the project upon which it intended to continue construction pending the Corps' review on remand was the WWTP which, the Court found, was approximately 29% completed as of November 2. The County asserted that continued work on the WWTP would not unduly prejudice the Corps' decisions

and that, in perspective of the hardships it would suffer if an injunction were to issue, equity cautioned against such relief.

The Injunction Opinion identified six factors that courts have considered in determining whether the sort of improper influence with which Plaintiffs were concerned was a legitimate threat under the facts of a given case. After reviewing the facts of record in this case as of November 2, and as they pertained to those six factors, the Court determined that "there [was] a substantial likelihood that continued construction of the WWTP pending the Corps' decision would increase significantly the pressure to approve the project as tendered and would create an environment in which there is a substantial risk that the environmental impacts would be viewed as tolerable." *Id.* at 37.

That determination, in turn, led to a finding that Plaintiffs had no adequate remedy at law, a legal prerequisite to the issuance of injunctive relief. *See id.* at 37. The Injunction Opinion also concluded that the other two prerequisites for injunctive relief (that the balance of the equities favors the moving party and that such relief serves the interests of the public) were satisfied. *See id.* at 37–45. For these reasons, the Injunction Opinion and accompanying order of injunction enjoined the County "from undertaking further construction on any and all aspects of the wastewater treatment project until such time as the United States Army Corps of Engineers completes the tasks with which it is charged pursuant to the August 14 Opinion." *Id.* at 48. The County amended its earlier notice of appeal to include the order of injunction.

## B. Developments Since November 2, 2001

Upon agreement of the parties, the November 2 Order of Injunction was amended to permit the County to undertake various construction tasks that the County had represented were essential to ensuring public safety and the structural integrity of the previously completed work.[5] Thereafter, on November 9, 2001, the County filed a Motion to Stay the injunction pending the outcome of its appeal from the August 14 and the Injunction Opinions. On November 16, 2001, the County filed a revised motion to stay the injunction.

After discussing the matter with the parties in a telephone conference, and the County having represented that it would withdraw its appeal of the Court's August 14 and November 2, 2001 decisions (and upon the consequent agreement of the Plaintiffs and the County), the Court determined that the County's motion to stay should properly be regarded as a motion to dissolve the injunction based on changed circumstances.[6] As represented, the County withdrew its appeal of the judgments entered on August 14 and November 2, 2001. The parties submitted

---

**5.** The County sought permission to undertake several different tasks at the site of the WWTP and, as of the date of issuance of this Memorandum Opinion, Plaintiffs have acquiesced to all but one of these tasks. By orders entered November 7 and 8, 2001, the Court amended the order entered on November 2 to permit the County to engage in each of the tasks to which Plaintiffs have agreed.

**6.** Because the County's appeal has been withdrawn and the revised motion to stay is being considered as a motion to dissolve the injunc-

tion, it is not necessary to address the contentions that the Court was not authorized to issue the injunction or that the injunction should not have been issued, both of which points were raised as arguments respecting the likelihood of success on appeal, an issue that is pertinent to a motion for stay but not to the motion to dissolve the injunction. At oral argument on the motion to dissolve, counsel for the County agreed that, upon abandonment of the County's appeal, those points were no longer at issue.

briefs addressing whether the injunction should be dissolved and, on December 4, 2001, the parties convened for an evidentiary hearing and oral argument on the County's motion to dissolve the injunction.

The principal change in circumstances upon which the County predicates its motion to dissolve is its decision to revise the designs for the project and to reapply to the Corps for the requisite permit (the "revised proposal"). Specifically, on November 16, 2001, the County filed with the Corps a permit application for the project that did not include the TC Interceptor, the aspect of the original proposal that would have given rise to the most substantial wetlands impact. Instead, the revised proposal provides for delivery of wastewater to the WWTP by using a force main (the "Lee–Davis force main") that would connect to an existing sewer line.[7]

Whereas it was estimated that construction of the TC Interceptor would have impacted 3.62 acres of wetlands,[8] the County estimates that construction of the Lee–Davis force main would impact permanently only about .0006 acre (about 240 square feet) of wetlands.[9] The reminder of the revised proposal is the same as the County's original proposal; that is, the project as completed would include the following components in addition to the Lee–Davis force main (which would replace the TC Interceptor as the delivery mechanism to the WWTP): (1) the WWTP (which has impacted .16 acre of wetlands); (2) the force main (which has impacted .06 acre of wetlands);[10] and (3) the outfall/diffuser (which will impact .005 acre, or 207 square feet of subaqueous wetlands).[11] Accordingly, the County represents that, if the revised proposal were permitted and constructed, "[t]he aggregate amount of permanently impacted wetlands will be 0.166 acre—less than two-tenths of an acre—of which 0.16 [at the site of the WWTP] were filled over a year ago by the County relying on Corps permits issued in

---

7. Specifically, the revised proposal envisions construction of a force main that would connect to an existing sewer in an area known as Beaverdam (the "Beaverdam Creek sewer"). Presently, the Beaverdam Creek sewer collects wastewater for approximately 3,100 acres of land and delivers it through a pump station into Henrico's wastewater treatment facility. The goal of the revised proposal is to divert this wastewater from Henrico and to deliver it to the WWTP for treatment (and subsequent discharge into the Pamunky River), thereby freeing up capacity under the County's contract with Henrico. Although the anticipated daily volume of wastewater that would be diverted under the revised proposal is approximately 50,000 gallons less per day (700,000 gallons per day) than that which the County anticipated under the project as originally planned (750,000 gallons per day), it is undisputed that the County would reap essentially the same benefit from the project under the revised proposal. The County does expect, however, that the contract with Henrico will continue to play a significant role in meeting its wastewater treatment needs under the Comprehensive Plan.

8. Originally, the TC Interceptor was said to impact about 9 acres of wetlands, but, in the previous regulatory process, the County took action to reduce the impact to 3.62 acres.

9. There would be an additional temporary impact upon approximately 5,600 square feet of wetlands under the revised proposal.

10. In its November 16, 2001 Revised Memorandum in Support of Motion to Stay, however, the County represents that this aspect of the project "will have no impact on wetlands[.]" The County attempted to reduce the wetlands impact of this aspect of the project through the use of a procedure known as "directional boring." See *Crutchfield v. United States Army Corps of Engineers*, Civil Action No. 3:00cv525, at 7, n. 6 (E.D.Va. November 2, 2001).

11. The Injunction Opinion did not find that this aspect of the project would have any appreciable impact on wetlands.

June, 2000." [12]

It is undisputed that, in furtherance of the County's intentions (as described in the revised proposal), the County's Board of Supervisors has removed from the project budget the funding (approximately $7 million) that previously had been approved for construction of the TC Interceptor. The Board of Supervisors also has approved the expenditure of approximately $2.1 million in construction funds for the Lee–Davis force main, as well as an estimated $400,000 to fund incidental costs associated with that alternative. The County has represented that it will not begin construction on the Lee–Davis force main until such time as the Corps issues the necessary permit therefor.

As explained in the Injunction Opinion, the cost to the County of complying with the November 2 injunction is substantial (although not all factors allegedly contributing to that cost are well documented). *See id.* at 8–9. It is not disputed, however, that, if the County ceases construction after it completes the work allowed by the modifications to the November 2 Order of Injunction, it will incur approximately $205,000 in stand-by costs each month that the injunction remains in place. *See id.* at 9. The County also faces as yet undetermined cancellation costs under contracts with various contractors and sub-contractors. *See id.* In addition, it is undisputed that maintenance of the injunction in its current form, and the concomitant loss of work for the County's general contractor, would lead that contractor to lay off between fifty and seventy-five construction workers currently assigned to the project. *See* Affidavit of F.T. Evans, 11/9/01 and

Letter from F.T. Evans to Steven P Herzog, 11/7/01.

The County has represented that it understands that "the Corps anticipates processing the [revised project] application as one for an individual permit." Affidavit of Frank Harksen, 11/16/01. The Corps confirms that it is following the procedures for assessing the project as a whole as a candidate for an individual permit. The Corps has represented that it expects to be able fully and properly to complete the tasks with which it is charged on remand, including making the ultimate decision whether to authorize the County to proceed with construction on any or all aspects of the revised proposal, within 105 days of receipt of a complete permit application. The parties dispute whether the materials that the County proffered to the Corps on November 16 constitute a "complete" application for these purposes, however, it is undisputed that the determination of completeness is entrusted to the discretion of the Corps.[13] Counsel for the Corps has represented that, because of the requirements of the regulatory guidelines with which the Corps must comply in deciding whether to issue the necessary permit for the project, the Corps likely could not render its decision in less than 105 days. The County anticipates that construction of the Lee–Davis force main "can be completed within twelve months after permitting so that the entire project ... can be brought online" by 2003, the target date as set forth in the Comprehensive Plan. Affidavit of Frank Harksen, 11/16/01.

Another change in circumstances manifested itself in a pleading filed by the Corps after the December 4 hearing on

12. In addition, the revised proposal contemplates temporarily impacting an additional .13 acre of wetlands.

13. The Plaintiffs have informed the Corps that, in their view, the permit application for the revised project is not yet complete. The Corps has advised that, within a matter of days, it will decide whether the application is considered complete.

the motion to dissolve. In that pleading, the Corps disclosed that the decision respecting permitting for the revised proposal will not be made by the same Corps' representatives who made the original decision that the August 14 Order vacated.

That is relevant because the Injunction Opinion explained that, in response to the August 14 Opinion, "the Corps ha[d] assigned the review to a new staff member who was not involved in the earlier decisional process. Apparently, however, the final decision will be made by the same chiefs who made the decision that was set aside for the reasons described in the August 14 Opinion." *Crutchfield v. United States Army Corps of Engineers,* Civil Action No. 3:00cv525, at 36 (E.D.Va. November 2, 2001). On December 6, 2001, and in contrast to the findings in the Injunction Opinion, the Corps confirmed that the new Project Manager will report not to the Section Chief who made the decision that the August 14 Order set aside, but to a new Section Chief (who was not involved in regulatory review of the project until after the original decision was made and whose usual duties are in a different geographical region).

## DISCUSSION

### A. The Appropriate Legal Standard

■ The County's motion to dissolve the November 2 injunction is made nominally pursuant to Fed.R.Civ.P. 60(b)(5) and (6). The parties appear to agree that Rule 60(b) provides the appropriate framework within which to consider the County's request. It should be noted that provisions of subsections (b)(5) and (b)(6) of Rule 60

are mutually exclusive. *See, e.g., Liljeberg v. Health Serv. Corp.,* 486 U.S. 847, 863, n. 11, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988). Because the basis for the County's motion is most appropriately directed at the provisions of Rule 60(b)(5), however, it is not necessary to consider either the merits thereof under subsection (b)(6) or the issue of mutual exclusivity.

■ Rule 60(b), which permits a court to afford a party relief from a judgment or order in certain situations, provides in relevant part:

> On motion and upon such terms as are just, the court may relieve a party ... from a final judgment, order, or proceeding for the following reasons: (5) the judgment has been satisfied, released, or discharged ... or *it is no longer equitable that the judgment should have prospective application;* or (6) *any other reason justifying relief from the operation of the judgment.*

The Fourth Circuit has explained that "when confronted with any motion invoking this rule, a district court's task is to determine whether it remains equitable for the judgment at issue to apply prospectively and, if not, to relieve the parties of some or all of the burdens of that judgment on 'such terms as are just.' " *Alexander v. Britt,* 89 F.3d 194, 197 (4th Cir.1996) (*citing Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) and *Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992), explaining that the district court should analyze a number of factors and focus on the remedy requested, the changed equities of the situation, and the nature of the injunctions involved).[14]

---

14. *See also Building and Construction Trades Council of Philadelphia and Vicinity, AFL–CIO v. NLRB,* 64 F.3d 880, 888 (3rd Cir.1995) (explaining that "[a] court of equity cannot rely on a simple formula but must evaluate a number of potentially competing considerations to determine whether to modify or

vacate an injunction ...." and listing relevant factors); *Bellevue Manor Assoc. v. U.S.,* 165 F.3d 1249, 1256–57 (9th Cir.1999) (court must "fulfill [its] traditional equity role: to take all the circumstances into account in determining whether to modify or vacate a prior injunction ...."); 42 Am.Jur.2d Injunc-

However, modification or dissolution of a permanent injunction is extraordinary relief and, as such, requires a showing of extraordinary circumstances. *See, e.g., Protectoseal Co. v. Barancik*, 23 F.3d 1184, 1186–87 (7th Cir.1994).

■ Relevant decisional law has identified a number of factors that serve to focus the inquiry whether to modify or dissolve an injunction. Among these are the following: (1) the circumstances leading to entry of the injunction and the nature of the conduct sought to be prevented; (2) the length of time since entry of the injunction; (3) whether the party subject to its terms has complied or attempted to comply in good faith with the injunction; (4) the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction; (5) whether the moving party can demonstrate a significant, unforeseen change in the facts or law and whether such changed circumstances have made compliance substantially more onerous or have made the decree unworkable; and (6) whether the objective of the decree has been achieved and whether continued enforcement would be detrimental to the public interest. *See, e.g., Alexander v. Britt*, 89 F.3d at 197; *Building and Construction Trades Council of Philadelphia and Vicinity*, 64 F.3d at 888; 42 Am.Jur.2d Injunctions § 312; 12 Moore's Federal Practice, 60.47[2][c]. This non-exhaustive set of factors provides a useful analytical framework within which to consider the County's motion to dissolve the November 2 injunction.

## B. Analysis

### (1) The Circumstances Leading to Entry of the Injunction and the Nature of the Conduct Sought to be Prevented.

■ The circumstances leading to entry of the November 2 injunction are set forth in great detail in the August 14 and Injunction Opinions. Those circumstances are also outlined at the beginning of this Opinion. Therefore, only a brief summary is necessary here.

In essence, the injunction was necessary because the Corps, acting in concert with, and upon the urging of, the County, made a patently illogical and rather obviously unlawful permitting decision. The August 14 Opinion determined that the Corps adopted that decision as an expedient, contrived in response to the pressure created by the imminent expiration of the NWP program under which the County sought to build the WWTP, the force main, and the outfall/diffuser while the Corps considered whether to issue an individual permit for the TC Interceptor. The County exacerbated that pressure by insisting that it needed to act quickly under the NWPs because its need for additional wastewater treatment was close at hand. The purpose of the injunction was to insulate, to the extent possible, the Corps' decision-making process on remand from the pressures that had produced the flawed decision that the August 14 Order vacated.

The Injunction Opinion articulated that, in perspective of the County's and the Corps' previous reaction to the pressures of regulatory review, there existed a real threat that continued construction of the WWTP during regulatory review on re-

tions §§ 307, 312 (2000) (confirming that flexible, totality of the circumstances approach is appropriate); 12 Moore's Federal Practice, 60.47[2][c] (Matthew Bender 3d ed.) (wide variety of factors may be considered but relevant factors will vary according to nature of relief sought).

mand could improperly affect the Corps' objectivity, a concern that the Fourth Circuit has made expressly cognizable as a predicate for injunctive relief. Further, the Injunction Opinion articulated that the approach that the Corps and the County previously had taken had frustrated the plain text of the applicable environmental statutes (and the clear intent of Congress) by avoiding completion of the requisite environmental assessments before, rather than after, construction on the project had taken place. The Injunction Opinion determined that the equities and the public interest weighed in Plaintiffs' favor, in part because the County had proceeded with construction of the project with knowledge that there was substantial uncertainty surrounding the legal validity of the permits under which it was proceeding. Any waste of public resources occasioned by the injunction was found to be the result of the County's decision to proceed under such circumstances. In addition, the Injunction Opinion concluded that, on the record, the County's need for increased wastewater treatment capacity, while substantial, was not so imminent that an injunction deferring completion of the WWTP until the Corps completed its review on remand would cause serious harm to the public. Therefore, the prerequisites of injunctive relief were held to have been satisfied and the County was enjoined from work on the project pending completion, on remand, of the Corps' environmental evaluations and permitting decision.

The Injunction Opinion makes quite clear the nature of the harm that it sought to prevent. As described above, that harm is the "substantial likelihood that continued construction of the WWTP pending the Corps' decision would increase significantly the pressure to approve the project as tendered and would create an environment in which there is a substantial risk that the environmental impacts would be viewed as tolerable." *Id.* at 37. On the

record as of November 2, that threat was real and, accordingly, it entitled the Plaintiffs to injunctive relief.

### (2) The Length of Time Since Entry of the Injunction

This factor does not require substantial explication. The injunction issued on November 2, 2001 and has been in effect for just over one month. The duration of the injunction, standing alone, certainly does not warrant its dissolution. Nor does the brevity of its duration foreclose whether it should be dissolved. Rather, the issue presented now is whether, during the month that it has been in effect, the circumstances underlying issuance of the injunction have changed so dramatically that "it is no longer equitable that [it] should have prospective application[.]" Fed. R.Civ.P. 60(b)(5).

### (3) Whether the County has Complied or Attempted to Comply in Good Faith With the Terms of the Injunction

There is no question that the County has complied with the terms of the November 2 injunction fully and in good faith. It sought leave of Court, as well as the Plaintiffs' consent, before undertaking tasks at the WWTP site that it determined were necessary to ensure public safety and to safeguard its previous investment in the project. It has pledged that it will continue to comply with Court orders. Therefore, there is no dispute on this factor.

### (4) The Likelihood that the Conduct or Conditions Sought to be Prevented Will Recur Absent the Injunction

It must be remembered that the purpose of the injunction was to assure, to the extent possible (given the already extensive construction of the project), that the permitting decision to be made on remand would be made free of the pressures that

had contributed to the making of the previous indefensible decision. The Corps represents that the County's completion of the WWTP will not influence its decision on remand. Moreover, the Corps has entrusted the permitting decision to a set of decision-makers different than those who made the improper permitting decision that the August 14 Order set aside. Those personnel changes, of course, constitute changed circumstances, and they reduce the risk that the Corps' decisional process on remand will be influenced by a desire to justify the outcome of the previous, procedurally flawed decision. Therefore, the Corps' conduct since issuance of the August 14 Opinion underscores its representation that, on remand, it will attempt to make a fresh start in the permitting process.

However, the issue is not really whether the Corps, having been shown and, indeed, having tacitly admitted, the error of its ways will in good faith endeavor to abide by the law. In fact, the Court presumes that it will do so. Nor is the salient question whether the new decision-makers will attempt to keep the previous flawed decision from affecting the calculus of the permitting decision on remand. Again, it can be presumed that they will try to do just that.

Rather, the issue is whether there is a real threat that "[f]urther investment of time, effort, or money in the proposed [project] would make alteration or abandonment of [it] increasingly less wise, and, therefore, increasingly unlikely." *Arlington Coalition on Transportation v. Volpe*, 458 F.2d 1323, 1333–34 (4th Cir.1972). A closely related issue is whether such investment—here completion of the WWTP—has the effect of diminishing options open to the Corps so that, "at some

point, [the Corps'] consideration [of the options] would become a meaningless formality." *Id.* The Fourth Circuit has recognized that, in cases such as this one, regulatory decisions "would inevitably be influenced" by major construction on the project before issuance of a regulator's statutorily required environmental assessments. *Maryland Conservation Council v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986).

■ Of course, where, as here, most of the construction lies beyond the boundary of the regulatory agency's jurisdiction, it "can be enjoined only when it has a direct and substantial probability of influencing" the Corps' decision. *North Carolina v. City of Virginia Beach*, 951 F.2d 596, 603 (4th Cir.1991). For the reasons set forth fully in the Injunction Opinion, the facts of record here present precisely that circumstance and that holding is the law of the case.

The County's argument seems to be principally that the probability of that influence coming to bear upon the Corps is diminished because the quantity of the wetlands affected has been significantly reduced by virtue of the revised proposal. In addition, the County contends that the probability of such extrinsic influence is further diminished by the reality that new Corps decision-makers will conduct the requisite regulatory review.[15]

Those arguments miss the mark, however, because what is at issue here is not merely the affected wetlands. Rather, what the Corps will be called upon to accomplish on remand is to consider all alternatives to the revised project, including, without limitation, abandonment of the already completed aspects of the project, the discharge of wastewater somewhere

---

15. At the time of briefing, the Corps had replaced only the Project Manager. Since the time that the County asserted this argument, however, the Corps has eliminated the former ultimate decision-maker from the process as well.

other than the Pamunkey River (the site of the proposed outfall/diffuser), and whether a regional solution to the problem is preferable than the construction of the project.[16] The existence of the wetlands, though they are quite small in size, confers upon the Corps jurisdiction to consider, in the permitting process, even those environmental impacts over which it does not have regulatory jurisdiction. *See* 33 C.F.R. §§ 325 App. B(7)(b); 320.4(a)(1); United States' Second Post–Hearing Submission, at 7–8. This type of complete assessment, of course, is what the Plaintiffs have argued from the outset that the Corps should have undertaken, and they have represented that they intend to seek consideration of these and other issues during the regulatory process that ensues remand.

The purpose of the injunction, therefore, was to keep open the Corps' options to make those, and other, permitting assessments even in the face of what the Injunction Opinion held to be a substantial probability of improper influence. The threat of that influence certainly cannot be expected to decrease if the WWTP is completed or significantly constructed while the regulatory process is underway or before it is completed. Indeed, the probability reasonably can be expected to increase in that event.

**(5) Whether the County Can Demonstrate a Significant, Unforeseen Change in the Facts or Law and Whether Such Changed Circumstances Have Made Compliance Substantially More Onerous Or Have Made the Decree Unworkable**

There is no dispute that, as a factual matter, the County has demonstrated that

circumstances have changed since November 2. The County has submitted a revised proposal and permitting application to the Corps which includes designs to transport wastewater to the WWTP through the Lee–Davis force main instead of through the TC Interceptor. The County's budget for the project no longer includes funding for the TC Interceptor. Although the parties dispute the importance of the possibility that the County might seek authorization to construct the TC Interceptor at some point in the future, it certainly is not part of the project as submitted to the Corps for review on November 16. As tendered to the Corps, the revised proposal contemplates permanent impact to 0.166 acre of wetlands (as opposed to the 3.84 acres that were expected to be impacted under the original proposal). Whereas the interceptor was expected to impact 3.62 acres of wetlands, the Lee–Davis alternative will impact approximately 240 square feet of wetlands. Finally, and as discussed above, the Corps has assigned different decision-makers to review the new permit application.

What the parties dispute is the significance of these changed circumstances. The County argues that, in perspective of the revised proposal, "the entire foundation for the Plaintiffs' complaint no longer exists. Indeed, the Complaint is moot." It suggests that the revised proposal contemplates construction of a project that would have *de minimis* impact on wetlands and, therefore, that the Corps' jurisdictional nexus to the project is even smaller than it was originally. Accordingly, the County posits that the relevant issue is "whether [the Court] can or should enjoin a large-scale County project from continued construction in Corps non-juris-

---

**16.** These are merely examples of issues that, upon this record, it appears that the Corps will be asked to confront. Nothing herein is intended to instruct the Corps what to consider or how to resolve the competing interests involved.

dictional areas where the only remaining additional permanent impact to wetlands [beyond the .16 acre of wetlands that was obliterated during construction of the WWTP before November 2] amounts to 240 square feet." [17]

Plaintiffs, on the other hand, assert that "[w]hatever the environmental effects of the County's revised proposal may be, they are to be assessed in the first instance by the Corps of Engineers, not this Court .... The point of the Court's injunction was to assure that the Corps retains freedom to reach ... a result [not biased by considerations related to continued construction on the project during the pendency of the permitting process]." They argue that nothing that would justify dissolution of the injunction has occurred since November 2.

When viewed in perspective of the actual basis for injunctive relief, the County's argument that the changed circumstances described above eliminate the need for the injunction lacks merit. The County submits that the fact that the revised proposal contemplates negligible impact on wetlands is a change in circumstance that warrants dissolution of the injunction. However, the Injunction Opinion recognized that "[t]he wetlands ... that have been, and would be, affected by construction of the project are small in area." All that has happened since then is that the wetlands impact has become even smaller. However, the parties agree that consideration of the allegedly *de minimis* impact on the wetlands, in the context of whether the County legally is permitted to proceed with the project as planned, is a matter for the Corps to consider in the first instance. That was true on November 2 and that remains true today.

To the extent that the County argues that, in light of the revised proposal, the entire factual predicate for Plaintiffs' lawsuit has disappeared and, therefore, the injunctive relief is no longer warranted, that argument cannot withstand serious scrutiny. Although the revised proposal is somewhat different than the original one, and although the County has filed with the Corps a new permit application, the project remains essentially the same. As explained in the August 14 and Injunction Opinions, the Plaintiffs, and the public, are entitled to a permitting environment in which the Corps' assessment of the revised proposal can be made as objectively as is possible under the circumstances. Those circumstances include previous permitting decisions made by the Corps at the Coun-

---

17. In addition, and in perspective of the equities and public interest aspects of the Injunction Opinion, the County posits that the recognition that fifty to seventy-five construction workers will be laid off in the event that the injunction remains in effect is a circumstance that warrants consideration under Rule 60(b)(5). Whether this fact makes compliance by the County with the injunction substantially more onerous is dubious. Nonetheless, it certainly is a factor worthy of consideration in assessing the public interest aspect of injunctive relief.

The Injunction Opinion explained that, with respect to financial liability caused by issuance of the injunction, "any complaint that public funds (whether in the form of cancellation or stand-by costs or the cost of construction to date) may go to waste must be viewed in light of the conduct of those to whom the expenditure of those funds has been entrusted." *Id.* at 38–39. As noted above, the collateral affect on construction workers' employment is a legitimate consideration in deciding the merits of County's motion. Nevertheless, in the final analysis, the regrettable fact that the workers will be laid off is a consequence of the County's decision to start, and to proceed with, construction while this action was pending. The County knew, or reasonably should have known, that, if the Plaintiffs prevailed, it was possible (if not likely) that construction would be enjoined (with all attendant circumstances, including that construction workers might be put out of their jobs).

ty's behest that were plainly illogical and not in accordance with law and that were influenced by not insubstantial pressures extrinsic to the merits of the issues. Those circumstances also include the Corps' representation that it likely will be able to complete the tasks with which it has been charged in approximately 105 days, which is substantially less time than the Injunction Opinion estimated it would take. Given the County's and the Corps' actions to this point, and in view of the fact that (however much rain falls in 2002) the County still has substantial unused capacity under the contract with Henrico, it is neither inequitable nor unduly burdensome to require the County to await the Corps' authorization before resuming construction.[18]

#### (6) Whether the Objectives of the Injunction Have Been Achieved and Whether Continued Enforcement Would be Detrimental to the Public Interest

Counsel for the County has argued that the injunction has served its purpose and that now, the County having eliminated from the project the component that would have impacted the greatest amount of wetlands, there is no need for the injunction to remain in effect. As explained above, however, the objectives of the injunction have not yet been achieved. The Corps still must evaluate the revised proposal in a regulatory environment free from the influence that continued construction on the WWTP reasonably can be expected to have on the decisional process. The objectives of the injunction will not have been achieved until the Corps has completed its evaluation in this manner.

Failure to dissolve the injunction, of course, will have some adverse effect on the public interest, specifically the loss of employment by the construction workers and the approximately $205,000 in standby costs (and possibly considerable, but as yet unproved, contract cancellation costs) for each month that the injunction remains in effect. These effects, however, are the result of application of the environmental statutes as enacted by Congress (and interpreted by circuit precedent) to the facts of record in this action. Thus, there is also a significant public interest to be served by continuing the injunction—that is, compliance by the County and the Corps with the federal environmental laws.

### CONCLUSION

For the foregoing reasons, and having considered all the pertinent factors and having reassessed the balance of the equities, the inadequacy of legal remedies for the Plaintiffs and the public interest, the Court finds that the changed circumstances do not warrant dissolution of the Injunction, and the County's Motion to Dissolve the November 2 injunction is DENIED.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**18.** If, for some reason, the Corps cannot complete its permitting process in the projected 105 day period, the County retains the prerogative to seek dissolution or modification of the injunction.